IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 31, 2009

STATE OF TENNESSEE, DEPARTMENT OF CHILDREN'S SERVICES v.
DEDRUS PETERSON, ET AL.

Direct Appeal from the Juvenile Court for Shelby County
No. R5363/I5733     Herbert J. Lane,  Judge

No. W2009-00281-COA-R3-PT - Filed August 27, 2009

This is a termination of parental rights case. Mother appeals the trial court's termination of her parental rights on grounds of persistence of conditions, abandonment by willful failure to visit or support, failure to substantially comply with the permanency plans, and mental incompetence. Finding that the grounds for termination of Mothers's parental rights are established by clear and convincing evidence in the record, and that termination is in the best interests of the minor children, we affirm.

**Tenn. R. App. P. 3. Appeal as of Right; Judgment of the Juvenile Court Affirmed**

J. STEVEN STAFFORD, J., delivered the opinion of the court, in which ALAN E. HIGHERS, P.J., W.S., and DAVID R. FARMER, J., joined.

Shantell S. Suttle, Cordova, Tennessee, for the Appellant, Dedrus Peterson.

Robert E. Cooper, Jr., Attorney General and Reporter, and Michael E. Moore, Solicitor General, Amy T. McConnell, Assistant Attorney General, Nashville, Tennessee, for Appellee, State of Tennessee, Department of Children's Services.

**OPINION**

Appellant D.P. ("Mother") appeals the trial court's termination of her parental rights to her six children, C.J.T. (D.O.B. 1/9/91), Q.P. (D.O.B. 2/15/94), A.P. (D.O.B. 7/15/96), J.S.P. (D.O.B. 9/28/97), D.A.P. (D.O.B. 11/22/2000), and M.C.S.P. (D.O.B. 12/15/2003).[1]  The Tennessee Department of Children's Services ("DCS," or "Appellee") first became involved with Mother in

---

[1] The parental rights of the putative, known, and unknown fathers of these children were also terminated in the court's final order.  However, Mother is the sole Appellant herein.

June 1997, when her children were taken into DCS custody. Custody was restored to Mother on April 20, 2000.

On May 2, 2005, DCS again petitioned the court for a finding of dependency and neglect with a protective custody order being entered on May 2, 2005. In its protective custody order, the court found that Mother had been arrested on April 29, 2005, on robbery charges. According to the order, the arresting officers reported that they were responding to a warrant that had been issued against Mother's boyfriend, who was on the Memphis Most Wanted list. They discovered Mother and her boyfriend in a hotel room, naked, and surrounded by drugs and weapons. The children, who were also in the room, were filthy, with the youngest child covered in dried feces. When she was arrested, Mother was pregnant with her seventh child. A hearing on the dependency and neglect petition was held and the children were found to be dependent and neglected on June 30, 2005. The children were placed with a foster family. When the children came into custody, they had physical scars and suffered nightmares. They would self-mutilate, hoard food, drink out of the toilet, wet the bed, and get into fights at school. The foster mother testified that M.C.S.P. had burns on her body when she first came into the foster home. This allegation is corroborated by a counselor from the foster agency, Camelot Care Center.

On June 16, 2005, DCS devised the first set of permanency plans for the children. The goal was reunification with Mother by June 16, 2006. To achieve this goal, Mother was required to submit to a mental health assessment, a drug and alcohol assessment, and to follow the recommendations of both. She was to maintain a safe and stable home, with no health hazards, and was to show proof of employment and steady income. In addition, Mother was asked to maintain a bond with the children, by adhering to the visitation schedule, and by demonstrating parenting skills during her visits so as to meet the physical and emotional needs of the children. She was also required to attend parenting classes and counseling.[2] The record indicates that Mother attended the plans' staffing, and signed the plans, which were approved by the trial court on August 9, 2005.

According to the record, DCS referred Mother to parenting classes at the Exchange Club, and to Midtown Mental Health for a mental health assessment. On September 21, 2005, Mother's case manager attempted to transport Mother to the assessment, but she refused to go. At the hearing, Mother testified that she participated in the assessment at Midtown Mental Health in November 2005; however, she did not provide copies of the results of that assessment, nor did she sign a release so that DCS could obtain the results. Mother did complete the parenting classes in November 2005. Around that time, DCS also assisted Mother in obtaining a house and furnishings.

On December 27, 2005, the permanency plans were revised; however, the goal and achievement date remained unchanged. The revised plans required Mother to attend a meeting with Frayser Family Counseling to learn about treatment for C.J.T.'s ADHD (a requirement unique to C.J.T.'s plan). Mother was required to maintain her housing, and to attend the children's school

---

[2] Mother's requirements were the same in each of the children's plans. Any requirements that are unique to a specific child will be noted throughout; otherwise, the requirement is applicable to all of the children.

meetings. Mother was also required to attend mental health counseling in order to submit to a mental health evaluation and to follow the recommendations thereof. Mother signed these plans, which were approved by the trial court on January 1, 2006.

On September 18, 2006, the permanency plans were revised for a third time. The plans had dual goals of reunification and adoption, with an achievement date of October 31, 2007. Mother was required to maintain safe, stable, and adequate housing, to participate in school meetings and decisions regarding the children's health and to provide proof of financial stability. She was also required to complete a mental health evaluation, and to follow its recommendations. Mother was also expected to resolve her legal issues, and to conduct herself appropriately around the children and their foster parents. Mother agreed to the plans, which were approved by the trial court on November 7, 2006. In approving these plans, the Juvenile Court noted that DCS had been making reasonable efforts to reunite Mother with the children, by providing furnishings for her home, helping her to obtain a mental health assessment, and providing her with parenting classes. The court further found that Mother had completed the plans' requirements that she obtain housing, attend parenting classes, and participate in a mental health evaluation. The record indicates that, in October 2006, Mother was evaluated at LeBonheur Center for Children and Parents ("CCP"). Dr. Sonny Gentry, who testified as an expert in clinical psychology at the hearing, performed the 2006 evaluation of Mother. Dr. Gentry had also performed a previous evaluation in 1997. The earlier evaluation was performed due to "the severe physical abuse of the two older children." Dr. Gentry testified that he had observed a deterioration in Mother's parenting skills from 1997 to 2006. The CCP further observed that Mother had poor judgment and "no insight that any of her parenting behavior was [in]sufficient." Furthermore, the 1997 CCP assessment tested her IQ at 74, which is in the borderline range of intellectual functioning, and "only four points above mildly mentally retarded." The IQ test was not repeated during the 2006 evaluation because "intelligence is considered a stable trait, and from observations obtained in this psychology, it is thought that the assessment results remain accurate." It was this low intellectual functioning combined with the psychological diagnosis of a personality disorder, and the denial of poor parenting skills that led CCP to opine that Mother has a high probability of abusing or neglecting the children again. Specifically, Dr. Gentry testified that Mother's "prognosis for future improvement was very poor [and] we recommended that her parental rights be terminated." Based upon this analysis, Dr. Gentry testified that, due to her poor insight and judgment, he did not believe that DCS could offer Mother any services that would remedy her parenting inadequacies. Dr. Gentry also noted that Mother was "surly and angry and defensive," and that, "[g]iven her pattern of functioning for more than 10 years, I think her prognosis is virtually zero," and that she is unlikely to change in the near future. CCP was ultimately unable to complete a full psychological assessment because Mother was uncooperative. DCS case manager, Dee Kangal, testified that CCP could have performed the required drug and alcohol assessment, but that Mother did not submit to these services.

The 2006 CCS assessment also included psychiatric evaluations of the five oldest children. The report indicates that, when they entered foster care, "all five of those children had pretty significant behavior and emotional problems. They really are special needs children." The report goes on to specify that the children "were aggressive, acting out, stealing things, taking their clothes

off, pretty serious behaviors." The children gave CCP "multiple reports of physical abuse, emotional abuse...[and] [m]ultiple reports of their Mother not protecting them from her boyfriends, who did terrible things to them." One of the children reported to the foster mother that Mother's boyfriend had put him in the oven and in the trunk of a car. Dr. Gentry testified that a change in caretakers [i.e., removal from the foster family] would be "emotionally dramatic for these kids."

When M.C.S.P. entered DCS custody, she was diagnosed with failure to thrive. In 2006, at 16 months old, her CCP evaluation revealed that she was still malnourished and was unable to hold her head upright. At the time of the trial, she was still underweight. J.S.P. was diagnosed with ADHD and needed counseling and medication. In 2008, she was placed in a special education class that provided tutoring in an effort to ready her for the correct grade level at school. When she first came into the foster home, J.S.P. displayed overt sexual behavior when playing with her dolls. Likewise, C.J.T. was diagnosed with "unruly behavior" and was prescribed psychotropic medication. At the time of the trial, Q.P. was no longer living in the foster home. In August 2008, he was deemed a danger to other children. After stabbing a child at school and sexually molesting a four-year-old boy, he was moved from the foster home into a "Level 3 " placement.

The foster mother testified that, once in her care, the children received counseling at their schools. They attended summer camps and participated in the Big Brothers and Big Sisters Club. The children also attend individualized educational programs, and received after-school tutoring. The record indicates that, since entering DCS's custody, the children's social skills have improved, they have been better behaved generally, and especially in school. The foster mother testified that she hopes to adopt all six children.

The record indicates that visits between Mother and the children were consistent until the summer of 2006. The children's foster Mother had been transporting the children to weekend visits at their grandmother's home where, Mother testified, she was also present. However, in July 2006, the Juvenile Court terminated visitation with the grandmother after learning that the children should not be exposed to the grandmother's husband, an alleged sexual predator. The last visit between Mother and the children was July 7, 2006. Mother testified that, once the children were kept from the grandmother's house, she was no longer able to visit with them. However, Ms. Kangal testified that she offered to arrange a visit on July 20, 2006, but that Mother indicated that she did not want to see the children if their foster mother was present.

On April 24, 2007, and in an amendment filed September 30, 2007 to add Q.P. and A.P. to the petition, DCS petitioned the court to terminate Mother's parental rights. As grounds, the petition alleges that Mother is mentally incompetent to care for her children; that she has abandoned them by willful failure to visit or support, and by failing to establish a suitable home; that she has failed to substantially comply with the permanency plans, despite reasonable efforts on the part of DCS; and that she has failed to remedy persistent conditions, which prevent the safe return of the children. DCS further asserts that termination of Mother's parental rights is in the best interest of the children.

The next permanency plan staffing was held on May 7, 2007. The goal was changed to adoption, but the achievement date remained October 31, 2007. Again, the plans require Mother to maintain stable, safe, and adequate housing, to maintain the furnishings and appliances provided to her by DCS, to participate in the children's school meetings, and health appointments, and to provide proof of stable income. Furthermore, Mother was required to provide her mental health records to DCS, and to complete psychiatric evaluations. In addition, she was to attend and complete appropriate parenting classes, and anger management classes if recommended. She was to resolve her legal issues, display appropriate conduct with her children and their foster parents, and maintain contact with DCS. Mother signed these plans, which were approved by the court.

In October 2007, DCS filed an affidavit of reasonable efforts that it had made to reunite Mother with the children. DCS averred that it had referred Mother to parenting classes at the University of Tennessee, and to Midtown Mental Health for a full psychiatric evaluation. DCS also attested to the fact that it had provided Mother with furnishings and appliances for the home. The trial court found that these efforts were reasonable, but that Mother had failed to comply with the permanency plans as her current whereabouts were unknown, and she had not maintained stable housing, nor completed a full psychiatric evaluation.

A final set of permanency plans was devised on September 20, 2007. The goal of adoption and Mothers's requirements remained unchanged. Mother did not participate in this staffing. On August 21, 2006, after the children were taken into custody, Mother pled guilty to the crimes she had committed prior to losing custody. These included felony theft over $1,000 (committed on January 6, 2005), felony identity theft (committed on July 14, 2004), and misdemeanor theft under $500 (also committed on July 14, 2004). Mother was placed on probation for two years; however, in November 2008, she was incarcerated for six outstanding warrants. At the time of the hearing, Mother was still incarcerated and was pregnant with her ninth child. Although she testified that she expected to be released in January 2009, she admitted that she did not know where she would live after her release.

According to DCS's proof, Mother never paid child support. Mother testified that she was employed for a month and a half in 2005 or 2006, but that she did not pay support during this time. She admitted that she had not provided DCS with any proof of income.

DCS's petition to terminate Mother's parental rights was heard by the Juvenile Court of Shelby County on November 24-25, 2008. In an order filed on January 6, 2009, and in an amended order filed on April 6, 2009, the trial court terminated Mother's parental rights on grounds of persistence of conditions, abandonment by willful failure to visit or support, failure to substantially comply with the permanency plans, and mental incompetence. The court also specifically found that DCS had made reasonable efforts to aid Mother, and that termination of her parental rights was in the best interests of the children. Mother appeals and raises five issues for review as stated in her brief:

I.  Whether the trial court erred by finding that there was clear and convincing evidence that [Mother] abandoned her children by willfully failing to visit.

II.  Whether the trial court erred by finding that there was clear and convincing evidence that [Mother] had not substantially complied with the permanency plan.

III.  Whether the trial court erred by finding that there was clear and convincing evidence that [Mother] was incompetent such that her parental rights should be terminated.

IV.  Whether the trial court erred by finding that there was clear and convincing evidence that there were persistent conditions that warrant termination of [Mother's] parental rights.

V.  Whether the trial court erred by finding that termination of [Mother's] parental rights was in the best interests of the children.

A parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn.1996). Thus, the state may interfere with parental rights only if there is a compelling state interest. *Nash-Putnam*, 921 S.W.2d at 174-75 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn.Ct.App. Apr. 29, 2005) (citing Tenn.Code Ann. § 36-1-113(g)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn.2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn.2002); Tenn.Code Ann. § 36-1-113©.

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 769. Consequently, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn.Code Ann. § 36-3-113(c)(1); *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable ... and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn.Ct.App.2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id*. at 653.

In light of the heightened standard of proof in these cases, a reviewing court must adopt the customary standard of review set forth by Tenn. R. App. P. 13(d). As to the court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise, in accordance with Tenn. R.App. P. 13(d). *Id.* We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. *Id.*

The trial court terminated Mother's parental rights on several grounds: (1) persistence of conditions pursuant to Tenn. Code Ann. § 36-1-113(g)(3); (2) abandonment by willful failure to visit or support pursuant to Tenn. Code Ann. § 36-1-113(g)(1); (3) failure to substantially comply with the permanency plans pursuant to Tenn. Code Ann. § 36-1-113(g)(2); and (4) mental incompetence pursuant to Tenn. Code Ann. § 36-1-113(g)(8). We will address each of these grounds in turn to determine whether DCS proved each by clear and convincing evidence.

## Persistence of Conditions

Tenn.Code Ann. § 36-1-113(g)(3) provides:

> (3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> > (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
> > (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
> > (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

In *In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005), this Court held that, "based upon the statutory text and its historical development, Tenn.Code Ann. § 36-1-113(g)(3) [grounds of persistence of conditions] applies as a ground for termination of parental rights only where the prior court order removing the child from the parent's home was based on a judicial finding of dependency, neglect, or abuse." As stated above the trial court adjudicated these children to be dependent and neglected on June 30, 2005. The specific conditions that led to this determination were that Mother and the children were found in a hotel room with a wanted felon and the children

-7-

were not properly cared for (in terms of their hygiene, nutrition, and general welfare and safety). At that time, Mother had no income, and no adequate housing. Moreover, she failed to demonstrate a present ability to properly care for the children.

At the time of the hearing, these conditions had not been remedied. The record indicates that Mother had not visited the children since 2006. On the day of trial, Mother was an inmate of the Shelby County Correctional Center; consequently, she had no housing and no employment. Dr. Gentry further testified that Mother's CCP prognosis was that her mental state was such that she will likely never be able to properly care for the children, and that she had made virtually no progress toward that end in the three years since the children had been in DCS custody. From the record as a whole, we conclude that there is clear and convincing evidence to support the trial court's finding that the conditions that led to the removal of the children from Mother's custody (more than three years prior to the hearing) had not been sufficiently remedied so that the children might be returned to her.

**Abandonment**

Tenn.Code Ann. § 36-1-102(1)(A) defines abandonment, in relevant part, as follows:

> (1)(A) For purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, "abandonment" means that:
> (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;
> (ii) The child has been removed from the home of the parent(s) or guardian(s) as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have

-8-

demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date;

"For purposes of this subdivision (1), willfully failed to visit means the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." Tenn.Code Ann. § 36-1-102(1)(E). Token visitation "means that the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn.Code Ann. § 36-1-102(1)©.

The record demonstrates that, since the children came into protective custody, Mother has provided no support. By her own testimony, Mother is able bodied and capable of working to support the children. Despite the fact that she testified that she was employed during some period of 2006, she admitted that she did not pay support during the time that she worked. Moreover, both the foster parents, and the DCS case manager testified that the children had not received anything (e.g., cards, gifts) from Mother since they came into custody. In short, Mother has made no efforts to support her children, and has provided no justifiable excuse for this failure.

Concerning visitation, the record demonstrates that DCS has made numerous attempts to assist Mother in visiting the children. However, Mother had not visited in the four months immediately preceding the filing of the petition to terminate and, in fact, had not visited since 2006. From the record as a whole, we conclude that there is clear and convincing evidence to support the trial court's finding that Mother has abandoned these children both in her failure to provide support, and in her failure to visit.

### Failure to Substantially Comply with the Permanency Plans

Mother's parental rights were also terminated on the ground of failure to substantially comply with her responsibilities as set out in the permanency plans. Tenn Code Ann.. § 36-1-113(g)(2). As discussed by this Court in *In re M.J.B.*, 140 S.W.3d 643 (Tenn. Ct. App.2004):

> Terminating parental rights based on Tenn. Code Ann. § 36-1-113(g)(2) requires more proof than that a parent has not complied with every jot and tittle of the permanency plan. To succeed under Tenn.Code Ann. § 36-1-113(g)(2), the Department must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place, *In re Valentine*, 79 S.W.3d at 547; In re L.J.C., 124 S.W.3d 609, 621 (Tenn. Ct. App.2003), and second that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met. *In re*

> *Valentine*, 79 S.W.3d at 548-49; ***In re Z.J.S.***, 2003 WL 21266854,
> at *12. Trivial, minor, or technical deviations from a permanency
> plan's requirements will not be deemed to amount to substantial
> noncompliance. ***In re Valentine***, 79 S.W.3d at 548; ***Department of
> Children's Servs. v. C.L.***, No. Tenn. R.App. P. 11 application filed).

*Id*. at 656-57.

As set out in more detail above, Mother's responsibilities under the parenting plans include: (1) maintain stable housing, (2) show proof of employment and steady income, (3) participate with the children, including visitation, school, and health care, (4) submit to CCP evaluation and follow all recommendations thereof, (5) resolve pending legal matters, and (6) act in a non-threatening manner when dealing with department personnel and the foster parents. These plans were ratified by the court, and, following our review, we agree that the plans are reasonable and related to the reasons that the minor children came into custody. Despite the fact that she participated in the majority of the staffings, and signed the plans, the record demonstrates that she has failed to substantially comply with any of her plan requirements. Giving her every benefit of the doubt, at most, this Court can find that she only complied with the CCP assessment task, but ultimately did not complete the evaluation as she did not return for one of the assessments. From the record as a whole, there is clear and convincing evidence to support the trial court's finding that mother failed to substantially comply with the reasonable responsibilities contained in the plans.

### Mental Incompetence

Tenn. Code Ann. § 36-1-113(g)(8)(B) provides that:

> The court may terminate the parental or guardianship rights of that
> person if it determines on the basis of clear and convincing evidence
> that:

> > (i) The parent or guardian of the child is incompetent
> > to adequately provide for the further care and
> > supervision of the child because the parent's or
> > guardian's mental condition is presently so impaired
> > and is so likely to remain so that it is unlikely that the
> > parent or guardian will be able to assume or resume
> > the care of and responsibility for the child in the near
> > future;

Dr. Gentry testified, concerning the 2006 CCP evaluation, that Mother "did not have the capability of providing her children with a safe and loving home and any child in her care would be at risk for harm." Dr. Gentry further testified that mother's condition had not changed from 1997, when she was first interviewed by CCP. Moreover, Dr. Gentry testified that Mother's IQ of 74, along with her self-defeating behaviors, renders her overall prognosis poor. Dr. Gentry opined that

-10-

social services would not be able to remedy Mother's condition. CCP ultimately recommended termination of Mother's parental rights, a recommendation made in only 3-5% of CCP's cases. From the totality of the circumstances, we conclude that there is clear and convincing evidence that Mother's current mental health, and her ongoing prognosis, make her incompetent to care for these children.

## **Best Interests**

Before a court in this State can terminate a biological parent's parental rights, it must find that doing so is in the best interest of the child. *See* Tenn Code Ann. § 36-1-113(c)(2). In determining whether termination of parental rights is in a child's best interest, the lower court must consider the following factors:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.Tenn. Code Ann. § 36-1-113(i).

-11-

This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *State v. T.S.W.*, No. M2001-01735-COA-R3-JV, 2002 WL 970434 (Tenn. Ct. App. May 10, 2002).

Based upon the foregoing discussion, it is clear that Mother has failed to make an adjustment of circumstances, conduct, or conditions so as to make it safe and in the children's best interests to be with her. Despite reasonable efforts on the part of DCS, Mother has failed to make a lasting adjustment and, in fact, it appears that such adjustment may not be possible. Mother has failed to support the children, and has failed to visit the children. Because of her absence from their lives, no meaningful relationship has developed between Mother and the children.

The record indicates that the children have done well in foster care. They have received proper services for their respective special needs, they have found stability, and have received proper care and love for perhaps the first time in their young lives. The foster parents have also expressed a desire to adopt. Because Mother has failed to make the difficult changes that would be necessary in order for her to take custody, and because the children are currently in a stable, caring, and loving environment, where they have a possibility of adoption, we conclude that termination of Mother's parental rights is in the children's best interests.

For the foregoing reasons, we affirm the order of the trial court. Costs of this appeal are assessed against the Appellant, Mother and her surety.

 

 

_____

J. STEVEN STAFFORD, J.