# IN THE COURT OF APPEALS OF TENNESSEE
# AT JACKSON

## Assigned on Briefs September 13, 2012

# IN THE MATTER OF: JEFFERY B. AND ANNE B.

**Direct Appeal from the Juvenile Court for Tipton County**
**No. 11-JV-224      William A. Peeler, Judge**

---

**No. W2012-00924-COA-R3-PT - Filed October 12, 2012**

---

The parental rights of Mother and Father to their two children were terminated based upon abandonment, persistent conditions, and non-compliance with the permanency plans. We affirm in part and we reverse in part; however, we affirm the termination of the parental rights of Mother and Father.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Juvenile Court Affirmed in Part and Reversed in Part**

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

Taylor D. Forrester, Knoxville, Tennessee, for the appellant, Jeffery B.

Randi L. Johnson, Covington, Tennessee, for the appellant, Clara B.

Robert E. Cooper, Jr., Attorney General and Reporter; Alexander S. Rieger, Assistant Attorney General, Nashville Tennessee, for the appellee, Tennessee Department of Children's Services

## OPINION

### I. FACTS & PROCEDURAL HISTORY

This case involves the termination of the parental rights of Jeffery B. and Clara B. to their minor children Jeffery, Jr.,[1] born July 15, 1999, and Anne, born October 11, 2001.

The Department of Children's Services ("DCS") has had a lengthy involvement with Jeffery B. ("Father") and Clara B. ("Mother"). The case history–specifically, regarding the removal and return of the children to the parents' custody–prior to the events leading to the instant termination petition is somewhat unclear. However, it appears that DCS began working with the parents in 2004 due to reported drug use and an alleged history of truancy regarding Mother's oldest daughter, Elizabeth P.[2] Mother and Father produced positive drug screens and were, therefore, ordered by the Tipton County Juvenile Court, in 2004, to participate in services including Targeted Case Management.[3]

In 2007, the family again came before the juvenile court regarding the lack of home school documentation, Mother's failure to comply with counseling and treatment recommendations, and continued drug use. In early 2008, Elizabeth P., Jeffery, Jr. and Anne were removed from the family home, but Jeffery, Jr. and Anne ultimately returned. Elizabeth P. also returned for a trial visit, but such visit was unsuccessful and she entered DCS custody on June 24, 2009.

Shortly thereafter, on August 14, 2009, a Protective Custody Order was entered removing Jeffery, Jr. and Anne from the family home based upon a dependency and neglect petition filed by the Guardian Ad Litem ("GAL") which stated that Christopher M.,[4] Mother's adult son, had been found in the family home in violation of a "no contact" order between him and Jeffery, Jr. and Anne. The juvenile court declared Jeffery, Jr. and Anne to

---

[1]Throughout the record, both "Jeffery" and "Jeffrey" are used. We will use "Jeffery" in this appeal, as it is the spelling used on the child's birth certificate.

[2]Herbert P. is Liz's father. The termination petition at issue sought to terminate, among other rights, Mother's and Herbert P.'s parental rights to Liz. However, an "Order Dismissing Petition to Terminate Parental Rights as to Herbert P[.]" was later entered. It is unclear whether this order was effective to dismiss the action regarding *Mother's* rights to Liz. In any event, we find the issue moot as Liz reached the age of majority on January 12, 2012.

[3]This history is taken from the juvenile court's June 24, 2010 "Adjudicatory and Dispositional Hearing Order."

[4]Father is not the father of Christopher.

be dependent and neglected on June 24, 2010.

On September 10, 2009, DCS created permanency plans, approved by the juvenile court, for Jeffery, Jr. and Anne aimed at returning the children to their parents' custody. To that end, the plans set forth the following requirements: (1) Mother and Father will submit to a drug and alcohol assessment and follow recommendations; (2) Mother and Father will submit to drug screens; (3) Father will attend parenting classes and Mother will apply parenting skills learned at prior parenting classes; (4) Mother and Father will attend therapeutic visitation with the children at least 4 hours per month; (5) Mother and Father will not allow Christopher M. to be in the home or allow anyone with a known criminal history to be around the children; (6) Mother and Father will maintain cleanliness in the home; (7) Mother and Father will continue in their individual counseling, following recommendations of counselors, and make records available.

At the request of the GAL, the juvenile court referred the family to the Center for Children and Parents ("CCP") at the Le Bohneur Children's Medical Center for further evaluation regarding, among other things, Mother's and Father's capacity to parent adequately. A Multidisciplinary Team Summary ("Summary") was issued by a Le Bonheur Lead Social Worker, Clinical Psychologist, and Psychologist, which included the following findings:

> [Father] and [Mother] each have severe personality and psychiatric difficulties, likely complicated by drug and/or alcohol abuse, making it impossible for either of them to function on a day to day basis to maintain a stable home and stable marriage, or to make responsible parenting decisions. Each accuses the other of being the cause of all the problems in the family, while acknowledging little or no responsibility for the role that he/she plays.

> [Father] reports a significant history of emotional instability and mental health issues including depression, anxiety/panic attacks, suicidal ideation and bipolar disorder. . . . He also has an extensive history of substance abuse and domestic violence and drug possession. . . . [Father] has demonstrated a longstanding, persistent pattern of inappropriate parenting of his children in that he has exposed them to domestic violence, substance abuse, verbal and emotional abuse and environmental neglect. Despite various interventions and services offered, [Father] has not shown evidence of increased stability or improved ability to parent. The prognosis for significant change is extremely poor.

> Testing reveals [Mother] to be of average to high average intelligence, with reading skills at the post-high school level and no obvious visual-motor

problems. Those assets, however, are offset by serious personality and mood problems, which were illuminated by other testing. . . . Personality testing reveals high levels of anxiety, dysthymia, and prominent self-defeating and dependent personality features. Additionally, there is evidence of fragile self-esteem, preoccupation with her physical functioning, extremely poor reality testing and a coping style marked by avoidance and inconsistency. [Mother] finds it very hard to deal with complex and demanding situations, and to manage uncomfortable feelings, she resorts to intellectualization, denial, and externalization of blame and rationalization. It seems that all these factors have, for a long time, been driving her to abuse alcohol and prescription drugs.

Based upon these findings, the CCP team recommended that Father "become meaningfully engaged in long-term therapy with a licensed therapist skilled in the treatment of personality disorders and substance abuse." Regarding Mother, it found "imperative[,]" "[i]n order to develop healthier, more adaptive ways of managing her anxiety and coping with daily stressors," "that [Mother] receive intensive cognitive-behavioral therapy as an adjunct to any drug therapy." It stated that "[t]he setting in which this is most likely to occur would be a three to six month, inpatient drug and alcohol treatment program, which is recommended for [Mother]." Finally, the CCP team recommended that "in the absence of concrete evidence that [Father] and [Mother] have successfully completed services to ameliorate the numerous problems that currently render them incapable of appropriately parenting their children, Anne, Jeffrey, and [Elizabeth P.] should not be returned to the custody of their parents."

As a result of the CCP evaluations, the permanency plans were revised on June 10, 2010, to require the parents' compliance with the CCP recommendations. Specifically, the revised plans required the following: (1) Mother will provide proof of AA and NA attendance; (2) Mother will enroll in long-term inpatient drug and alcohol treatment program; (3) Father will attend and complete long-term therapy, skilled in treatment of personality and substance abuse; (4) Mother and Father will address domestic violence in individual counseling; (5) Mother and Father will have stable means of income.[5]

On July 25, 2011, DCS filed a Petition to Terminate Rights against Mother and

---

[5]The revised permanency plans state that "Jeff will attend individual counseling to help him become more assertive." Father's counsel concludes that this is a requirement of his client; we tend to disagree. Throughout the plans, "Jeff" is used to reference the child, whereas "Mr. [B.]" is used in reference to Father. Additionally, concerns regarding Jeffery, Jr.'s inability to stand up to Anne are raised throughout the record. In any event, we will not focus on Father's failure to complete this specific counseling, nor upon any failure by DCS to exert reasonable efforts in assisting Father with such.

Father[6] alleging the following grounds against both Mother and Father: (1) abandonment - failure to provide a suitable home; (2) substantial non-compliance with permanency plan; and (3) persistent conditions. It also alleged the ground of "abandonment - failure to support" against Mother. A trial was held over three days in November 2011, January 2012 and February 2012 in the Tipton County Juvenile Court in which extensive testimony was elicited and numerous exhibits were submitted . Thereafter, on March 27, 2012, the juvenile court entered an order terminating the parental rights of Mother and Father to Jeffrey, Jr. and Anne. As to both parents, the juvenile court found the following grounds had been proven by clear and convincing evidence: (1) abandonment - failure to provide a suitable home; (2) substantial non-compliance with permanency plan; and (3) persistent conditions. Additionally, it based Mother's termination upon her abandonment by failure to support, and it based Father's termination upon his abandonment by failure to visit. Thus, the juvenile court found that DCS had proven each ground alleged, plus it found the additional ground of abandonment for failure to visit had been proven against Father. Additionally, the juvenile court determined that DCS had made reasonable efforts and that termination was in the children's best interest. Mother and Father timely filed separate notices of appeal.

## II.  ISSUES PRESENTED

Mother and Father present the following issues for review, as summarized:

1.      Whether DCS proved the termination grounds by clear and convincing evidence;[7]

2.      Whether DCS made reasonable efforts to make it possible for the children to return home; and

3.      Whether parental termination is in the best interests of the children.

For the following reasons, we affirm in part and we reverse in part; however, we affirm the termination of the parental rights of Mother and Father.

---

[6]As stated above, the petition also initially sought to terminate the parental rights of Mother and Herbert P. to Liz.

[7]Curiously, Father challenges only the trial court's findings of persistent conditions and abandonment by failure to visit. His brief does not list as an issue for review, whether the trial court erred in finding abandonment by failure to provide a suitable home. However, within his argument that the trial court erred in finding *persistent conditions*, he argues that he has maintained a suitable home. Thus, out of an abundance of caution, we will consider whether the trial court erred in terminating Father's parental rights based upon abandonment by failure to provide a suitable home.

# III. STANDARD OF REVIEW

"A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the Due Process Clause of the federal and state constitutions." *In re J.C.D.*, 254 S.W.3d 432, 437 (Tenn. Ct. App. 2007); *In re Audrey S.*, 182 S.W.3d 838, 860 (Tenn. Ct. App. 2005). Although the parent's right is fundamental and superior to the claims of other persons and the government, it is not absolute. *In re J.C.D.*, 254 S.W.3d at 437. A parent's right "continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination." *Id.*; *see also In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

In Tennessee, proceedings to terminate a parent's parental rights are governed by statute. "Parties who have standing to seek the termination of a biological parent's parental rights must prove two things." *In re Audrey S.*, 182 S.W.3d at 860; *see also In re M.J.B.*, 140 S.W.3d at 653. First, they must prove the existence of at least one of the statutory grounds for termination, which are listed in Tennessee Code Annotated section 36-1-113(g). *Id.* Several grounds for termination are listed in subsection (g), but the existence of any one of the grounds enumerated in the statute will support a decision to terminate parental rights. *In re S.R.C.*, 156 S.W.3d 26, 28 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). Second, the petitioner must prove that terminating parental rights is in the child's best interest, considering, among other things, the factors listed in Tennessee Code Annotated section 36-1-113(i). *In re Audrey S.*, 182 S.W.3d at 860. Because no civil action carries graver consequences than a petition to sever family ties forever, both of the elements for termination must be proven by clear and convincing evidence. *Id.* at 860-61. In sum, "[t]o terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006) (citing *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). Clear and convincing evidence has been defined as evidence that "eliminates any serious or substantial doubt concerning the correctness of the conclusion to be drawn from the evidence." *In re L.J.C.*, 124 S.W.3d 609, 619 (Tenn. Ct. App. 2003) (quoting *In the Matter of: C.D.B., S.S.B., & S.E.B.*, 37 S.W.3d 925, 927 (Tenn. Ct. App. 2000)). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Audrey S.*, 182 S.W.3d at 861.

Because of this heightened burden of proof in parental termination cases, on appeal we must adapt our customary standard of review as set forth in Tennessee Rule of Appellate Procedure 13(d). *In re Audrey S.*, 182 S.W.3d at 861. First, we review each of the trial court's specific factual findings *de novo* in accordance with Rule 13(d), presuming the

finding to be correct unless the evidence preponderates against it. *Id.* Second, we must determine whether the facts (either as found by the trial court or as supported by the preponderance of the evidence) clearly and convincingly establish the elements required to terminate parental rights. *Id.* Whether a statutory ground has been proven by the requisite standard of evidence is a question of law to be reviewed *de novo* with no presumption of correctness. *In re R.L.F.*, 278 S.W.3d 305, 312 (Tenn. Ct. App. 2008) (citing *In re B.T.*, No. M2007-01607-COA-R3-PT, 2008 WL 276012, at *2 (Tenn. Ct. App. Jan. 31, 2008)).

## IV. DISCUSSION

### A. Grounds for Termination

#### 1. Abandonment

The first ground for termination listed in the statute, and the one most frequently relied upon, is abandonment. *In re Audrey S.*, 182 S.W.3d at 862. For purposes of terminating parental rights, there are five alternative definitions of abandonment listed in Tennessee Code Annotated section 36-1-102(1)(A)(i)-(v). The two definitions relevant in this case define "abandonment" as where:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child[.]

(ii) The child has been removed from the home of the parent(s) or guardian(s) as a result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such

a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date.

Abandonment can be established by showing that a parent *either* willfully failed to visit, willfully failed to provide support, or made no reasonable efforts to provide a suitable home. These failures must have occurred in the four months immediately preceding the filing of the termination petition currently before the court. **Tenn. Code Ann. 36-1-102(1)(A)(i),(ii)**; *see also In re D.L.B.*, 118 S.W.3d 360, 366 (Tenn. 2003). Again, the termination petition was filed on July 25, 2011; therefore, the relevant period is March 25 to July 25, 2011.

### a. Failure to Visit

Pursuant to the permanency plans, Mother and Father were required to attend supervised therapeutic visitation with the children at least four hours per month. The bi-weekly two-hour visits occurred in Jackson, and Mother and Father lived in Covington. Because of transportation issues, DCS typically transported the parents to the visits.

At trial, testimony was elicited regarding the parents' visitation with the children. It was undisputed that Mother attended most of the scheduled visits, and her parental rights were not terminated on this ground. However, Father's parental rights were terminated, in part, on this basis, and with the exception of Father's own testimony, the evidence indicated that Father frequently missed scheduled visits.

DCS family service worker Teresa Harris, who began assisting the parents with visitation transportation in March 2011, testified that, at some point, in an effort to stimulate the parents' own initiative, DCS agreed to transport the parents to only one visit per month, thus obligating the parents to secure independent transportation to the other visit. However, when the parents were unable to meet this obligation, DCS made arrangements to transport the parents "to most all of the visitations." Despite DCS assistance, however, Teresa Harris testified that "[Father] had attended a few of the visitations[,]" surmising that "he's missed half[.]" She explained that after retrieving Mother for a visit, she would drive by Father's home to offer him a ride, but she "could not catch up with him[.]" Father offered her no explanation for his absences. Similarly, team leader Veronica Gooch testified that Father had failed to maintain regular visitation with the children.

At trial, Father claimed that at least four scheduled visits were cancelled without prior notice to him. However, when asked whether he had missed "any scheduled visits," he acknowledged that he had because he "was sick and running a fever[.]"

In its order terminating parental rights, the juvenile court found that Father had abandoned the children "because he willfully failed to visit with the children when he was afforded the opportunity to do so, [and because] he missed numerous appointments and opportunities to visit even when transportation was provided by DCS." On appeal, Father again alleges that visits were cancelled, apparently by DCS, without being rescheduled. He also claims that he testified at trial that he "missed only one (1) visit because he was running a fever." Therefore, Father claims "there is no evidence" to establish abandonment by willfully failing to visit.

Although not mentioned by the parties on appeal, we note that the Petition to Terminate Parental Rights does not allege the ground of abandonment by failure to visit against Father.[8] Although testimony regarding visitation was elicited, this testimony relates not only to abandonment, but also to failure to comply with the permanency plans, which required visitation. Moreover, in opening statements before the juvenile court, Father's counsel specifically noted that abandonment by failure to visit had not been alleged against Father, and it does not appear that DCS attempted to assert the ground against him. Accordingly, we cannot find that this issue was tried by the juvenile court pursuant to Tennessee Rule of Civil Procedure 15.02, and therefore, we must find that the juvenile court erred in terminating Father's parental rights on this ground.

### b. Failure to Support

As stated above, "abandonment" includes situations where a parent has "willfully failed to visit" or has "willfully failed to make reasonable payments toward the support of the child." **Tenn. Code Ann. § 36-1-102(1)(A)(i)**. "[W]illfully failed to support" or "willfully failed to make reasonable payments toward such child's support" is defined as "the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments[9] toward the support of the child[.]" **Tenn. Code Ann. § 36-1-102(1)(D)**.

In its order terminating parental rights, the juvenile court found that although Mother was aware of her duty to support the children, she had, without justifiable excuse, failed to provide support beyond token gifts. It found that even if she could not pay the court-ordered

---

[8]This ground was, however, raised as to Herbert. P.

[9]"Token support" under the statute "means that the support, under the circumstances of the individual case, is insignificant given the parent's means." **Tenn. Code Ann. § 36-1-102(1)(B)**.

amount,[10] that she "could have paid something[.]"[11] Thus, it terminated Mother's parental rights on this ground.

On appeal, Mother concedes that she has paid no child support since Jeffery, Jr. and Anne were taken into DCS custody.[12] However, Mother argues that such failure is not *willful* because she lacks the ability to pay.

Again, the relevant time period for support is March 25, 2011 to July 25, 2011. At trial, Mother testified that from January to May 2011, she received $38.00 per month in disability benefits. However, in June 2011, she began receiving disability benefits of $700 per month. As of January 2012, she was also receiving $200 per month in food stamps, but it is unclear when such benefits began. Mother testified that even with the current $700 disability benefits and $200 in food stamps, after deducting her $400-$500 per month rent as well as her utility costs, she is left with only $100-$150.

"Willfulness" in the context of a parental termination does not require the culpability required by the penal code. *In re Audrey S.*, 182 S.W.3d at 863 (citation omitted). Ill will is not required. *Id.* Rather, "[w]illful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent." *Id.* (citations omitted). "'[F]ailure to support a child is 'willful' when a person is aware of his or her duty to support, has the capacity to provide the support, makes no attempt to provide the support, and has no justifiable excuse for not providing the support.'" *In re Emilie A.M.*, No. E2011-02416-COA-R3-PT, 2012 WL 4053040, at *7 (Tenn. Ct. App. Sept. 17, 2012) (citing *In re M.L.D.*, 182 S.W.3d 890, 896 (Tenn. Ct. App. 2005)).

Simply put, the evidence presented does not demonstrate that Mother "has the capacity to provide the support" ordered. During two of the relevant four months, Mother's income was at most $238,[13] which is less than her rent obligation. Moreover, the record is lacking

---

[10]Despite a thorough review of the record, we have been unable to determine the amount ordered to be paid by Mother.

[11]From the bench, the juvenile court stated that it found "no evidence of long-term disability that would prevent [Mother] from working and no evidence of any true effort on her part to get a job or to improve her situation[.]" However, it does not appear that the trial court's oral ruling was incorporated into its written order. *See In re Adoption of E.N.R.*, 42 S.W.3d 26, 31 (Tenn. 2001) ("[A] court speaks through its order, not through the transcript.").

[12]At trial, Mother testified that she's "taken [her] children money and clothes and things."

[13]This calculation includes $200 in foods stamps, which she may have been receiving at this time.

regarding Mother's employability, and her receipt of disability benefits weighs against a conclusion that she was able to obtain employment. ***See State, Dept. Of Children's Servs. v. Peterson***, 341 S.W.3d 281, 290 (Tenn. Ct. App. 2009) (noting that the mother was "able bodied and capable of working" in its abandonment by failure to support analysis). In sum, we find that DCS failed to demonstrate Mother's willful failure to support the children during the four-month period preceding the termination petition, and therefore, we find that the juvenile court erred in terminating her parental rights on this ground.[14]

### c. Failure to Provide a Suitable Home

Both parents' parental rights were terminated based upon the trial court's finding that they had abandoned the children by failing to provide a suitable home. According to the parties, Mother and Father have lived apart since mid-2010. Much evidence was presented at trial on the state of their respective homes.

At trial, CASA Elaine Crown testified that Mother has a "hoarding issue" and she described Mother's home as follows: "There were dirty dishes this high on top of the table, the sink was full of dishes, there was food, . . . there were boxes. It was . . . really awful." She described Mother's home as "very cluttered" and the bedrooms "in disarray." She stated that the "sheets on the bed, I'm sorry, didn't look like they had been washed in a couple of years. The carpets were filthy, filthy. There was stuff piled everywhere. Not in the bedrooms so much . . . . But the clutter in the living room and kitchen was still really awful, and it just was not - - not a fit place for children to live." Ms. Crown testified that between August 2010 and March 2011, Mother's home had no working water, and therefore, she flushed her toilets by filling buckets of water at a gas station. At trial, Ms. Crown stated she asked Mother whether she believed the children could live in such an environment, to which Mother replied, "well, I guess really not."

Despite Mother's lack of cooperation in providing access to her home, CASA Elaine Crown completed a home study in Mother's home. Her report, dated September 2011, was entered into evidence. In her report, Ms. Crown expressed "grave concerns" with allowing the children to return home, noting that Mother "has not even mentioned her hoarding problem to her therapist let alone started working on it." She stated that Mother's "house was <u>much</u>, <u>much</u> worse than when she last allowed me in 18 months ago." Specifically, she noted that the house was not adequately furnished, that it was hard to determine whether essential items were present due to the "immense clutter," and overall, that the home was

---

[14]We further note that in closing arguments, DCS argued that Mother had failed to demonstrate an ability to provide a stable income. It contended that even with her current disability benefits, there remained a question as to whether she would be able to afford essential services and child-rearing expenses.

"unsanitary[,]" "[f]ilthy, cluttered, [and] looked like it hadn't been touched in months (if not at least a year)."

DCS team leader Veronica Gooch similarly testified that Mother's home is not a healthy and safe environment for the children and she acknowledged disrupted utility services to the home. However, Ms. Gooch had been unable to enter Mother's home since 2010 because Mother explained that she needed to "clean things up" before she would allow her inside.

At trial, in response to CASA Elaine Crown's testimony regarding a stack of dishes left in Mother's kitchen, Mother stated that the dishes were actually clean. She further claimed that the doors and windows of her home were not "cluttered or stacked up[,]" and that the home's overall clutter problem had improved. However, Mother acknowledged, "It has been difficult to afford the necessary things to put things in their place and cleaning products and so forth, you know, to - - to do an absolute makeover." She testified that the home currently had working utilities.

DCS family service worker Teresa Harris testified that Mother has not allowed her to enter her home in order to observe its conditions. However, she had twice visited Father's home, mostly recently in September 2011, describing it as "like a two-bedroom apartment and . . . his bedroom is set up. The second room is not set up. It's cluttered, but that's home for him." Ms. Harris testified that "The home may be liveable for [Father], but I don't think it would be liveable for a child at this present state the way it's set up, no." She stated, "There was a broken-down bed, there was boxes, there was clothing items. It was stuff. You had to walk around the stuff just to get to this bedroom there in the back. I'm not exaggerating." stated that "you're going to have to really move - - take all this stuff out of there . . . in order to really set it up to be liveable." Ms. Harris also expressed concern about a 12 year-old boy and a 10 year-old girl sharing a "very small room[,]" but Father testified that if the children are returned, he would prepare the second bedroom and he would sleep on the couch or recliner, as he claimed he does currently, and allow each child to have his or her own bedroom. When asked whether Father's home could become suitable by clutter removal and preparation of the second bedroom, Ms. Harris replied, "I couldn't say. But all I know is right now, it is cluttered." Ms. Harris was concerned that, like Mother, Father may also have a hoarding problem. She explained that "What I would consider junk to me would be considered treasure for him." She did state that Father's home had working utilities.

CASA Elaine Crown also testified regarding her "great concerns about the safety" of Father's home. She stated, "There's only a front door; there's not a back door. There are only three windows[, which are too high for escape]. And if there were a fire, there's no way

-12-

for the children to get out. . . . There was . . . quite a bit of clutter when I was there." Ms. Crown testified, "I don't see Jeff or Anne being able to live there." However, in her homestudy report, Ms. Crown found that Father's home was equipped with adequate food and essential items. Further, she found the kitchen clean, the bathroom "relatively clean," and the house sanitary, although the carpets needed to be cleaned. She found the bedrooms were cluttered, but she noted that this was partially due to the presence of a prior tenant's belongings, which were to be removed.

In response, Father testified that "the [clutter] situation wasn't nearly as bad" as Ms. Teresa Harris testified, and he claimed that "the situation has been rectified." He stated that the utilities had been connected without interruption since he moved into the home one and one-half years prior, and that the home had a working stove, refrigerator, toilet, shower, and bathtub. He further stated that the home was stocked with food and that the two bedrooms were equipped with beds. During his testimony, several photographs of his home were introduced depicting the home as well-equipped and without significant clutter. However, from the record, we cannot determine when these photographs were taken.

In its Order on Petition for Termination of Parental Rights, the juvenile court made the following relevant findings of fact:

> [T]he testimony revealed that both homes of the Respondents remained cluttered; that there were hoarding issues; that [Mother] would not allow access to the home so that it could be inspected; and that [Father]'s home did not meet the standards that CASA and DCS felt were safe and adequate for the children to return home.

Further, it made the following conclusion of law:

> [T]he Respondents have not fully addressed their drug and alcohol issues; their domestic violence issues and their mental health concerns. Further, the Respondents have demonstrated a lack of concern for the children to such a degree that it appears unlikely that they will be able to provide a safe and suitable home for the children at an early date.

We find clear and convincing evidence to establish abandonment by both parents by failure to provide a suitable home.[15] The overwhelming evidence indicates that when case

---

[15]We specifically reject Mother's assertion, on appeal, that in determining whether Mother provided a suitable home, we may look only at whether the issue which brought the children into custody–according

(continued...)

-13-

workers were allowed in her home, Mother's home was found to be excessively cluttered, unsanitary, and ultimately, unsuitable. Even if we assume that the photographs of Father's home demonstrate improvement in his hoarding tendencies, "a suitable home requires more than a physical space." *In re A.D.A.*, 84 S.W.3d 592, 599 (Tenn. Ct. App. 2002) (noting that a child with permanent injuries required a home with the presence of a care giver, unlike the drug addicted mother); *see also In re Noah D.*, No. M2011-01087-COA-R3-PT, 2012 WL 184347, at *4-5 (Tenn. Ct. App. Jan. 20, 2012) (finding that a suitable home for the children required someone who could supply care and attention on a consistent basis).

The lack of a suitable environment in Father's home was clearly and convincingly demonstrated at trial. The CCP Summary stated:

> [Father] reports a significant history of emotional instability and mental health issues including depression, anxiety/panic attacks, suicidal ideation and bipolar disorder. . . . He also has an extensive history of substance abuse and domestic violence and drug possession. . . . [Father] has demonstrated a longstanding, persistent pattern of inappropriate parenting of his children in that he has exposed them to domestic violence, substance abuse, verbal and emotional abuse and environmental neglect.

Based upon this finding, Father was required to, among other things, attend and complete long-term therapy skilled in treatment of personality and substance abuse, and to address domestic violence in individual counseling. However, Father acknowledged that he has not fulfilled these requirements, although he did pass two drug screens.

Moreover, the CASA testified that she would go "weeks and weeks" without successfully contacting Father, and when she would finally make contact, he explained that he had stopped visiting the children because "he was just so depressed that he couldn't . . . bear to talk about it and he didn't want to see anybody or talk to anybody, which concerned [her.]" Elizabeth P. also testified that Father has "a little bit of an anger problem. He - - he'd have his outbursts towards my mother[,] me[,] and the children. And, I mean, he has been violent with my mother as well as me and my older brother." She stated that in order for the children to return, Father "would have to have serious counseling issues about his . . . bipolarness, I guess you could call it, his extreme anger outbursts, and then his extreme apologetic stages that just went straight back to the anger." She explained,

---

[15](...continued)
to Mother, Christopher M.'s presence in the home–has been remedied. The statutory ground simply does not limit our review as Mother suggests.

-14-

[Father] would have the outbursts where he would get completely upset and, you know, he'd go on a rampage and then he'd come back after a minute and he would just like be so - - so apologetic. You know, like . . . oh, my gosh, I can't believe this happened, I just want to go . . . hit my head on something I feel so bad. But then he'd go back and do the same things again.

. . . .

It was mostly verbal arguments. But sometimes it would get a little bit on the physical side. He would grab [Mother] or push [Mother] or something [of] that nature. Never hit her[.]

Elizabeth P. further testified that Father used illegal drugs in the family home. Moreover, Father was arrested eight times between 1997 and 2010 on domestic violence charges, as well as four times between 1997 and 2008 on alcohol and drug related charges.

Beyond the physical state of Father's home, based upon Father's failure to address his serious mental health, drug, and domestic violence issues, we find clear and convincing evidence exists to support the trial court's determination that he abandoned the children by failing to provide a suitable home for them.

### 2. Substantial Non-Compliance with Permanency Plan

Parental rights may be terminated upon finding clear and convincing evidence that "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan[.]" **Tenn. Code Ann. § 36-1-113(g)(2)**. "Terminating parental rights based on Tenn. Code Ann. § 36-1-113(g)(2) requires more proof than that a parent has not complied with every jot and tittle of the permanency plan." ***In re M.J.B.***, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). Rather, "[t]o succeed under Tenn. Code Ann. § 36-1-113(g)(2), the Department must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place, and second that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." ***Id.*** (citations omitted).[16]

---

[16]*See also* Tennessee Code Annotated section 37-2-403(a)(2)(C): "Substantial noncompliance by the parent with the statement of responsibilities provides grounds for the termination of parental rights, notwithstanding other statutory provisions for termination of parental rights, and notwithstanding the failure of the parent to sign or to agree to such statement if the court finds the parent was informed of its contents,

(continued...)

Here, the juvenile court found that the permanency plan requirements are "all reasonable and related to remedying the conditions that necessitated foster care and are particularly important in reducing the risk of harm to children so that the children could be safely returned to their parents' care." However, the court found that Mother and Father had failed to substantially comply with these requirements, and therefore, it terminated their parental rights pursuant to Tennessee Code Annotated section 36-1-113(g)(2). Specifically, the court found:

> The record is replete with evidence of non-compliance, including but definitely not limited to, [Mother] failing to enter a long-term inpatient alcohol and drug program; [Father] failing to obtain a parenting assessment and a mental health assessment; both [Father and Mother] failing to comply with the CCP recommendations, as well as[] failing to address their domestic violence issues other than by simply separating.

On appeal, Father does not argue that he substantially complied with the requirements of the permanency plans. Instead, he argues that DCS failed to exert reasonable efforts.[17] His argument will be addressed below.

On appeal, Mother asserts alternative arguments regarding the substantial compliance issue. First, she contends that "the sole reason the children came into custody was because Mother was allowing Christopher M. to be around the children," and that the permanency plans' requirements concerning "drug- and alcohol-related mental health issues, domestic violence, and hoarding" are not reasonably related to prohibiting contact between Christopher M. and the children. Alternatively, she argues that if the children were removed for reasons beyond the no-contact order violation, that the requirement that she complete a three-to-six month inpatient treatment program was unreasonable because she completed a 28-day program at Serenity. As a second alternative, Mother argues that she substantially complied with the permanency plans' requirements by completing the Serenity program, by attending AA meetings, by maintaining a stable income and by providing a clutter-free home.

---

[16](...continued)
and that the requirements of the statement are reasonable and are related to remedying the conditions *that necessitate foster care placement.*" (emphasis added).

[17]Insofar as Father's brief could be construed as arguing that he substantially complied with the requirements of the permanency plans, we find that he did not. The evidence indicated that he failed to, among other things, "become meaningfully engaged in long-term therapy with a licensed therapist skilled in the treatment of personality disorders and substance abuse," he failed to continue individual counseling, and he failed visit the children as required.

Mother correctly points out that the Guardian Ad Litem's August 13, 2009 Petition for protective custody represented that the children were dependent and neglected based upon her attached recitation of facts related to Christopher M. being found in the then-family home in violation of a protective order. Specifically, the attachment stated that Christopher M. had failed to appear in court on several occasions, and a capias has been issued for his arrest. Christopher M.'s bonding company received a tip that he had been hiding at the home of Mother and Father. The bonding company observed Christopher M. smoking a cigarette out of a back window of the home. When no one answered the bonding company's knocks and calls at the door, a bonding company representative kicked the door, and Mother then allowed the representatives inside. The representatives observed Mother, Father, Jeffery, Jr. and Anne in the home, but Mother denied that Christopher M. was present. However, Christopher M. was located in a bedroom, which Anne had just exited. According to the GAL's petition, Christopher M. "was hidden in a small cabinet or chest which had been locked or latched shut with clothes piled up in front of the door. . . . Christopher M. attempted to stab [the bonding company representative] with a pen and fought with him as [the representatives] attempted to take him into their custody." A bottle of liquor was found in the bedroom, and the representatives believed Christopher M. had been drinking.

First, we reject Mother's contention that the permanency plan requirements may be related only to the detrimental conduct specifically alleged in the GAL's dependency and neglect petition. As cited above, the relevant statute requires only that the permanency plan's requirements "are related to remedying the conditions *that necessitate foster care placement*." **Tenn. Code Ann. § 37-2-403(a)(2)(C)**. (emphasis added). In any event, although the initial permanency plans created for Jeffery, Jr. and Anne indicate that Mother's harboring of Christopher M. led to state custody, the plans further indicate that her "ability to protect the children from harm. Lack of supervision of older sibling Elizabeth [P.] and persist[e]nce of condition" prevent the children from exiting state custody, thus necessitating foster care placement. Regarding "persistence of condition," the petition to adjudicate Elizabeth P. recites reported drug use by both parents, and her permanency plan indicates the parents' need to obtain mental health/parenting assessment to identify issues contributing to their "troubled family situation."

Again, the permanency plans set forth the following requirements: (1) Mother will provide proof of AA and NA attendance; (2) Mother will enroll in long-term inpatient drug and alcohol treatment program; (3) Father will attend and complete long-term therapy, skilled in treatment of personality and substance abuse; (4) Mother and Father will address domestic violence in individual counseling; (5) Mother and Father will have stable means of income; (6) Mother and Father will submit to a drug and alcohol assessment and follow recommendations; (7) Mother and Father will submit to drug screens; (8) Father will attend parenting classes and Mother will apply parenting skills learned at prior parenting classes;

(9) Mother and Father will attend therapeutic visitation with children at least 4 hours per month; (10) Mother and Father will not allow Christopher M. to be in the home or allow anyone with a known criminal history to be around the children; (11) Mother and Father will maintain cleanliness in the home; and (12) Mother and Father will continue in their individual counseling, following recommendations of counselors, and make records available.

We agree with the trial court's conclusion that these objectives were reasonably related to addressing the problems identified in the family home which necessitated the children's removal–namely, suitable home, parenting, drug/alcohol, mental health, and domestic violence issues. Specifically, we find reasonable the requirement that Mother complete a long-term inpatient drug and alcohol treatment program, which was recommended by the CCP at LeBonheur.

At trial, Mother acknowledged that the 28-day Serenity and the 3-6 month Memphis Recovery programs were not equivalent to one another, but she determined, herself, that Serenity was enough to meet her needs. The highly-qualified professionals at the CCP at the Le Bohneur Children's Medical Center, after an extensive evaluation of Mother, found it "imperative[,]" "[i]n order to develop healthier, more adaptive ways of managing her anxiety and coping with daily stressors," "that [Mother] receive intensive cognitive-behavioral therapy as an adjunct to any drug therapy." It stated that "[t]he setting in which this is most likely to occur would be a three to six month, inpatient drug and alcohol treatment program, which is recommended for [Mother]."

We find no basis for concluding that requiring Mother to complete a long-term inpatient program was unreasonable. We note that Mother was fully aware that long-term therapy was required of her before she made the independent decision to enroll in short-term therapy. Moreover, we find that Mother's completion of a short-term 28-day program, which did not include detoxification, did not substantially comply with the requirement that she complete long-term inpatient therapy with detoxification. Similarly, we reject Mother's argument that she substantially complied with the requirements of the parenting plans by attending AA meetings, by maintaining a stable income and by providing a clutter-free home. At trial, despite Mother's claim that she received a six-month AA chip, she was unable to produce any proof of AA attendance, extensive testimony of deplorable living conditions was presented, and although Mother testified regarding disability benefits, she nonetheless, would struggle to provide for the children. The trial court's finding that Mother failed to substantially comply with the requirements of the permanency plans is affirmed.

## 3. Persistent Conditions

Finally, the juvenile court found that DCS had established by clear and convincing evidence the ground for termination commonly referred to as "persistent conditions" which is set forth in Tennessee Code Annotated section 36-1-113(g)(3)(A)-(C):

> (3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
>> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
>> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
>> (C) The continuation of the parent or guardian and child relationship greatly diminished the child's chances of early integration into a safe, stable and permanent home[.]

On appeal, Father attempts an argument previously raised by Mother with regard to other issues. He contends that "[t]he sole reason for the removal of [the children] was based on the violation of the [no-contact] order[,]" and therefore, that by separating from Mother, "he has remedied the sole initial [reason] for the removal of the minor children." This argument again fails. The relevant statute clearly states that persistent conditions may be found where, among other requirements, "[t]he conditions that led to the child's removal *or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s)*, still persist[.]" **Tenn. Code Ann. § 36-1-113(g)(3)(A)** (emphasis added).

The evidence presented at trial overwhelmingly demonstrated that the conditions which prevented the children's safe return continue to persist and are unlikely to be remedied quickly so that the children may be returned to their parents' homes. As was more fully discussed above, Father has a long history of substance abuse, mental illness, and domestic violence, which remains untreated. Although Mother and Father were separated at the time of trial, and Father claimed that he was "physically scared" of Mother, the juvenile court expressed concern regarding their relationship, noting that "the evidence at trial indicates that he still watches her home to observe the going and coming of others[,]" and DCS team leader Veronica Gooch testified that his domestic violence issues should be addressed

notwithstanding the parties' separation, because domestic violence could "possibly" occur with whomever he resides. Moreover, Father refused to accept responsibility for his poor choices, blaming the domestic violence arrests on being set-up by Mother and Christopher M., indicating that he is unlikely to seek assistance regarding these issues.

Similarly, Mother has failed to address her serious issues related to alcohol and drug abuse and environmental neglect, and it appeared that Christopher M. still frequents her home. At trial, Mother acknowledged her alcohol abuse, explaining that when she ran out of her prescribed medication, she would self-medicate with alcohol, drinking two pints of vodka per week. She also acknowledged smoking marijuana on "a few occasions." Additionally, Father testified that Mother drank vodka every day and that he had seen Mother use illegal drugs in front of the children. This testimony was corroborated by Elizabeth P., who testified that Mother smoked marijuana in the home, and that she had to hide alcohol from Mother, as well as by Mother's arrest record, which included various drug charges. DCS family service worker Teresa Harris testified regarding Mother's non-compliance with drug testing, stating that "more than once" Mother failed to appear for the testing. Moreover, Mother failed to complete the required long-term inpatient drug and alcohol treatment, determining, on her own, that a short-term program without detoxification was sufficient. Like Father, Mother refused to accept responsibility for her poor choices. She testified that it has been the GAL's "goal from the very beginning to alienate [her] children from [her], to keep [them] separated as long and as far apart as possible."

DCS team leader Veronica Gooch testified that Mother had domestic violence issues with Christopher M. as well as with Father, even after Mother and Father separated. However, despite a referral by DCS, Mother failed to address these issues in individual counseling. In fact, Mother thwarted counseling efforts by destroying a release of information document previously executed which authorized DCS to access Mother's physical and mental health records. However, at trial, Mother testified that she had begun counseling one week prior to trial.

At trial, Mother testified that Christopher M. does not live with her, but that "[h]e comes and goes." She claimed, however, that if the children are returned to her that she will keep Christopher M. away from them. However, when Veronica Gooch visited Mother's home in July 2011, she saw Christopher M. exiting through the back door, and he answered affirmatively when she asked whether he lived with Mother. A short time later, Mother acknowledged to Ms. Gooch that Christopher M. was living with her "because he didn't have anywhere to go at that time." Additionally, at trial, Father testified that he had not been in Mother's home in the prior year and a half, but that he had seen Christopher M. "come out of the house on three occasions." However, Sherry Harris testified that when she visited Mother's home she saw no one living in the home with Mother. CASA Elaine Crown

testified that she was allowed into Mother's home once in 2011. She saw no evidence that Christopher M. was living there, but she asked Mother for, and never received, Christopher M.'s address. In its order terminating parental rights, the juvenile court made a factual finding that "Christopher [M.] still lived in [Mother's] home (allegedly not all the time) despite the no-contact order." The evidence presented certainly does not preponderate against this finding.

In sum, we find that the conditions which prevented the children's return to Mother and Father–including, but not limited to, drug and alcohol abuse, mental health issues, domestic violence, environmental neglect, and the presence of Christopher M.–continue to persist and are unlikely to be remedied in the near future. Thus, we affirm the trial court's termination of the parental rights of Mother and Father on the ground of persistent conditions.

## B.    Reasonable Efforts[18]

Having determined that grounds for the termination were clearly and convincingly proven, we now address the parties' arguments regarding the adequacy of DCS's efforts in this case. Our Supreme Court recently addressed DCS's statutory obligation to use "reasonable efforts" to preserve, repair, and restore parent-child relationships whenever the circumstances require it to intervene in family matters. *In re Bernard T.*, 319 S.W.3d 586 (Tenn. 2010). The Court explained:

> The General Assembly has characterized the reasonable efforts that the Department must make "the exercise of reasonable care and diligence by the [D]epartment to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1). Accordingly, the manner in which the Department renders services must be reasonable, not herculean. *In re Georgianna H.*, 205 S.W.3d [508, 519 (Tenn. Ct. App. 2006)]. In addition, the Department is not required to shoulder the burden alone. The parents must also make reasonable efforts to rehabilitate themselves and to remedy the conditions that required the removal of the children. *State, Dep't of Children's Servs. v. Estes* (*In re Q.E.*), 284 S.W.3d 790, 800-01 (Tenn. Ct. App. 2008);

[18]At trial, Father's counsel alleged that DCS had failed to respond to discovery requests regarding its reasonable efforts, and therefore, that DCS should be estopped from alleging that such reasonable efforts were made. However, the juvenile court determined that Father should have filed a Tennessee Rule of Civil Procedure 37 motion to compel, and the juvenile court found that Father's Rule 37 motion made at trial came too late. Father does not challenge the trial court's ruling in his list of "Issues Presented for Review," but he attempts to raise it, without citation to authority, within his "reasonable efforts" argument. Because Father failed to properly present the issue before us, we decline to address it.

*In re Tiffany B.*, 228 S.W.3d [148, 159 (Tenn. Ct. App. 2007)]. The reasonableness of the Department's efforts should be decided on a case-by-case basis in light of the unique facts of the case. *In re J.C.D.*, 254 S.W.3d 432, 446 (Tenn. Ct. App. 2007). Among the factors that may be used to evaluate the reasonableness of the Department's reunification efforts are: (1) the reasons for removing the child from the parent's custody, (2) the parent's physical and psychological abilities and deficits, (3) the resources available to the parent, (4) the parent's response to and cooperation with the Department's reunification efforts, (5) the resources reasonably available to the Department, (6) the duration and extent of the parent's efforts to address and remedy the conditions that required the removal of the child, and (7) the closeness of the fit between the condition that led to the initial removal of the children, the requirements of the permanency plan, and the Department's efforts. *In re J.C.D.*, 254 S.W.3d at 446; *In re Giorgianna H.*, 205 S.W.3d at 519.

*Id.* (footnotes omitted). The child's health and safety shall be the paramount concern. **Tenn. Code Ann. § 37-1-166(g)(1)**.

On appeal, Father contends DCS failed to assist him in locating therapy facilities. At trial, Father testified that he had difficulty locating a therapist specializing in the treatment of personality disorders and substance abuse, and he had his attorney draft a letter to DCS indicating such and requesting assistance. However, according to Father, "a lack of reasonable efforts was displayed by Sherry Harris when she suggested [he] should locate an appropriate therapist by going through the telephone book[,]" and when she allegedly admitted that she did not help Father locate a therapist. He further claims that a lack of reasonable efforts was demonstrated when Teresa Harris testified that she contacted no therapy facilities on Father's behalf because she was unaware of a duty to do so.[19]

Father is correct that, at trial, Teresa Harris testified that she had not assisted Father in contacting psychiatric/therapeutic counseling facilities. She explained, however, that Father never indicated to her that he was having difficulty locating the specific counseling needed, he never sought her assistance in arranging counseling, she was unaware she was to assist in such scheduling, and importantly, that a prior caseworker "had assisted [Father] with trying to locate an agency that would meet his needs[,]" but after a therapy appointment was scheduled, Father failed to show up. Similarly, Veronica Gooch testified that Sherry Harris

---

[19]Both Father and Mother also allege that DCS failed to file an affidavit of reasonable efforts pursuant to Tennessee Code Annotated section 37-1-166(c). However, "failure to comply with this statutory requirement, is not fatal as long as DCS presents sufficient, specific evidence to establish the reasonableness of its efforts." ***In re Arteria H.***, 326 S.W.3d 167, 179 (Tenn. Ct. App. 2010) (citations omitted).

had assisted Father with finding facilities that provided the specific counseling required by the CCP. DCS, apparently like Father, experienced difficulties locating such facilities, but Ms. Harris ultimately located a facility, and she arranged for both Father's admission and transportation; however, Father failed to show up.[20] Based upon this testimony, we conclude that DCS exerted reasonable efforts to assist Father in obtaining the requisite therapy.

In his brief to this Court, Father argues that "The continuance of any other persistent conditions [beyond the presence of Christopher M.] arguably continues to exist because of DCS' failure to employ reasonable efforts." In response to his vague argument, we further note that DCS assisted Father in obtaining a CCP evaluation and an alcohol/drug assessment, but Father did not follow through with the recommendations; DCS offered transportation to supervised visitation, but Father failed to attend at least half the time; and DCS instructed Father to arrange parenting classes, even providing him with a phone number, but Father failed to complete the required classes, although he at first lied by stating that he had.

In her brief, Mother acknowledges that DCS "provided her with transportation to her visits with the children, arranged for her to enter inpatient treatment at Memphis Recovery Center, and paid for and facilitated the CCP evaluation." However, she contends that reasonable efforts were not made because "there is no evidence in the record that DCS provided a mental health assessment other than the CCP evaluation or the parenting assessment." She also states that it is unclear whether the homemaker services and drug and alcohol assessment were provided to Mother during a prior episode with the family or during the current custodial episode. She also claims that DCS failed to assist her in securing out-patient, in-home counseling, which would have been more convenient given Mother's transportation difficulties.

It is unclear why Mother suggests a mental health assessment beyond the expensive, comprehensive CCP evaluation was necessary.[21] Additionally, even if DCS did not provide a drug and alcohol assessment to Mother during the current custodial episode, it nonetheless, exerted reasonable efforts to address her drug and alcohol issues–specifically, it arranged for

_____

[20]Father testified that he was forced to cancel the appointment because DCS could not provide him with transportation. Sherry Harris stated that Father had misstated the appointment date, and she was unable to make transportation arrangements on short notice.

[21]On appeal, Mother points out that the CCP evaluation was not completed within four months of the children's removal. However, of the termination grounds alleged, only abandonment requires that reasonable efforts be made within four months. Of the abandonment types, only abandonment for failure to provide a suitable home was found by this Court against Mother–a ground, as to Mother, unrelated to the CCP evaluation. Moreover, with regard to Father, reasonable efforts to remedy Father's abandonment were made within four months of removal–for example, assistance with parenting skills and drug screening.

her to enroll in long-term inpatient drug and alcohol treatment program, which she failed to attend. Further, Mother's environmental neglect issues could have been addressed in therapy, but Mother failed to complete such or even to notify her therapist of her hoarding problem. Moreover, Mother failed to make environmental improvements following her prior homemaker services–in fact, the situation progressively worsened–and Mother often refused DCS personnel access into her home to observe its conditions. Finally, we refuse to hold DCS responsible for failing to assist Mother in securing a counseling type of her choosing which did not comply with the permanency plans' requirements. We affirm the trial court's finding that DCS exerted reasonable efforts to both Father and Mother in this case.

## C.  Best Interests

Once a ground for termination is established by clear and convincing evidence, we must consider whether termination of parental rights is in the children's best interest. In evaluating the children's best interest, we are to consider numerous factors including, but not limited to, those set forth in Tennessee Code Annotated section 36-1-113(I):

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
>
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
>
> (7) Whether the physical environment of the parent's or guardian's home is

healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parents or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

As discussed at-length above, both Father and Mother have failed to address their significant alcohol and drug, mental health, and domestic violence issues, which prevents the children's safe return to their homes. Their lack of motivation to comply with the requirements necessary to bring about a return of the children indicates that no lasting adjustment will soon be made. Additionally, Christopher M., who engaged in domestic violence with Mother and who has an extensive criminal record for drug abuse and violent conduct, continues to "come[] and go[]" in Mother's home.

The children entered DCS custody in August 2009; however, prior to then, the children had "been in and out of their parents' home maybe one or two years." Jeffrey, Jr. has been in the same foster home since August 2009, but due to his need for long-term care,[22] the home is not adoptive. However, Jeffery, Jr. would be allowed to stay in his current foster placement until an adoptive home is selected. Anne has been moved throughout several foster homes, but a prior foster home has indicated an interest in adopting her, and Anne desires for such adoption to occur.

Mother has visited with the children regularly, but Father has not. Elizabeth P., who had lived in the family home, testified that returning the children to Mother and Father would "[m]ore or less" place them in harm's way and DCS team leader Veronica Gooch believed that returning the children would negatively affect their emotional and psychological health. CASA Elaine Crown stated that adoption was in the children's best interest, because if the children returned to Mother and Father, it would only be a short time before they were back in foster care. The CCP team recommended that "[in the absence of concrete evidence that [Father] and [Mother] have successfully completed services to ameliorate the numerous problems that currently render them incapable of appropriately parenting their children,

---

[22]Jeffery, Jr. has been diagnosed with Asperger's syndrome.

Anne, Jeffrey, and [Elizabeth P.] should not be returned to the custody of their parents." The evidence in this case is both clear and convincing that termination of the parental rights of Mother and Father is in the children's best interest.

## V. CONCLUSION

For the aforementioned reasons, we affirm in part and we reverse in part; however, we affirm the termination of the parental rights of Mother and Father. Costs of this appeal are taxed equally to Appellants, Jeffery B., Sr. and Clara B., for which execution may issue if necessary.

_____

ALAN E. HIGHERS, P.J., W.S.