IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
October 15, 2019 Session

IN RE C.L. ET AL.

Appeal from the Juvenile Court for Hawkins County
No. HJ-17-0830          Daniel G. Boyd, Judge

_____

No. E2018-02032-COA-R3-PT

_____

C.A. (petitioner) filed a petition to terminate the parental rights of H.L. (mother) and R.L. (father) with respect to their two children, C.L. and A.L. (the children). The trial court found clear and convincing evidence to terminate mother and father's parental rights on two grounds: abandonment by willful failure to support and persistent conditions. The court also found clear and convincing evidence that termination of mother and father's parental rights is in the best interest of the children. Both parents appeal. We vacate the trial court's finding that there is clear and convincing evidence to terminate mother and father's parental rights on the ground of abandonment by willful failure to support. Nevertheless, we affirm the court's order terminating mother and father's parental rights because there is clear and convincing evidence that termination is supported by the ground of persistent conditions and is in the best interest of the children.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed as Modified; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and THOMAS R. FRIERSON, II, J., joined.

Gerald T. Eidson, Rogersville, Tennessee, for the appellant, H.L.[1]

Samuel E. White, Kingsport, Tennessee, for the appellant, R.L.

William E. Phillips, II, Rogersville, Tennessee, for the appellee, C.A.

---

[1] Mr. Eidson did not appear for oral argument. Pursuant to Tenn. R. App. P. 35(g), the case was submitted on the record, briefs, and arguments presented by counsel for father and counsel for petitioner.

- 1 -

**OPINION**

**I.**

In September 2016, police allegedly observed father erratically driving a golf cart inside a private storage facility. The children were passengers. Father was arrested and charged with evading arrest, resisting arrest, driving under the influence, and two counts of reckless endangerment. During father's brief incarceration, DCS placed the children with paternal grandparents because mother's whereabouts were unknown. Mother retrieved the children shortly thereafter. When father made bond, mother returned the children to him.

On September 29, 2016, petitioner (mother's aunt) filed a petition for emergency custody, alleging that: mother and father were separated and going through a divorce; father had been arrested; mother was unable to keep the children because she did not have a permanent home; and that mother returned the children to father despite her awareness of father's neglect and alcohol abuse. The trial court granted the petition.

At the preliminary hearing, the court found probable cause that the children were dependent and neglected. Accordingly, the court entered an order providing that petitioner would retain temporary custody of the children. Mother was granted unsupervised visitation at the marital apartment every other weekend from Friday at 7:30 p.m. to Sunday at 7:30 p.m. Father was granted supervised visitation at the home of paternal grandparents on alternating weekends. The order prohibited father from transporting the children. The order also instructed father to complete a psychological assessment and follow treatment recommendations.

In November 2016, a CASA representative conducted a home visit at father's two-bedroom apartment.[2] Father was living with his new girlfriend. Mother was also present. According to the CASA representative, father said that the apartment was being treated for bed bugs. Father also said that he drank six to eight beers per day for several weeks at the direction of his doctor. CASA later obtained medical records indicating that father was cautioned against drinking alcohol. At the time, father was unemployed. He stated that he was receiving about $500 per month in food stamps and that a friend was providing cash assistance.

On December 1, 2016, the parties attended a Child and Family Team Meeting. At this meeting, parents agreed to take various steps in order to regain custody of the children. Father agreed to maintain stable housing, secure legal income, submit to a psychological evaluation, and follow treatment recommendations. Mother agreed to obtain stable housing, secure legal income, submit to a mental health assessment, and

---

[2] CASA stands for "court appointed special advocates."

- 2 -

follow treatment recommendations. Both parents agreed to stop smoking in the presence of the children.

On December 9, 2016, a CASA representative followed up with mother, who was living at maternal great-grandmother's house. Because the smell of cigarette smoke in the home was so strong, the meeting took place in the CASA representative's car. According to the CASA representative, mother said that father was verbally abusive and very controlling; mother also expressed concern that father did not pay enough attention to the children. Mother denied making these statements. Later in December, mother missed an appointment for a mental health assessment; she claimed that she had to go to the hospital for an emergency dental procedure.

Father completed a psychological evaluation in December 2016. The examiner's diagnostic impression was that father suffered from moderate alcohol-use disorder, an unspecified personality disorder, and parent-child relational problems. The evaluation stated that father "would benefit from alcohol and drug treatment to focus on his pattern of substance use and on relapse prevention." The evaluation also recommended "therapy which addresses appropriate insight, judgment, and impulse control."

There is a dispute as to whether mother completed a mental health assessment in January 2017. At trial, mother testified that she completed the assessment and that she received a letter from the service provider stating that no further treatment was necessary. According to counsel for mother, this letter was not brought to the court's attention prior to trial because mother and her counsel believed that DCS already had a copy of the letter. Neither the mental health evaluation nor the aforementioned letter is in the appellate record. The trial court did not make a finding as to whether mother completed the assessment; the court merely noted that mother "has not provided the recommendations of her mental health assessment to which she testified she had submitted . . . ."

At the January 2017 adjudicatory hearing, mother and father stipulated that the children were dependent and neglected.[3] Accordingly, on January 26, 2017, the court entered an order declaring that the children were dependent and neglected. The order provided that petitioner would retain temporary custody of the children. The visitation schedule remained unchanged. The order also stated that parents had to comply with the following requirements before requesting further relief:

> [Father] will follow all recommendations from his Psychological Evaluation which includes alcohol and drug treatment to focus on his pattern of substance use and on

---

[3] At trial, both parents denied that the children were dependent and neglected. Father allegedly stipulated to dependency and neglect on the advice of counsel. He is now represented by new counsel.

relapse prevention. He is also to have therapy which addresses appropriate insight, judgment, and impulse control;

[Mother] is to undergo a Mental Health Assessment and follow all recommendations;

Both parents are to attend and complete parenting classes;

[Mother] is to obtain and maintain stable and safe housing free from environmental concerns;

[Father] is to obtain and maintain stable and safe housing free from environmental concerns;

Both parents obtain and maintain a legal source of income to take care of themselves and their children;

[Father] resolve all criminal charges;

Both parents are encouraged to take steps to obtain their GED.

[N]o individual is to smoke in the presence of the children[.]

(Paragraph numbering omitted.)

At some point, father moved into a new two-bedroom home. By February 2017, father was working as a cab driver. He also made money cleaning a storage facility. Mother continued living with relatives. In or around March 2017, mother got a job at a gas station, but she quit after a few weeks. Mother claimed that an undiagnosed medical condition was causing her to experience blackouts, which prevented her from working. Mother also testified that she sometimes worked with father and used her car as a cab.

At a "review hearing" in March 2017, the trial court heard testimony from a CASA representative and the guardian ad litem. The court found that "the parents have made only minimal progress at best[.]" Accordingly, the court ruled that its previous orders would remain in effect.

In April 2017, mother obtained her own three-bedroom apartment. When the children visited, they each had their own room and a full-size bed. At trial, maternal grandmother testified that mother's rent was fully subsidized by the government. She also testified that mother received a "check" for her utilities. Mother testified that she did not receive, and had not applied for, food stamps.

The trial court initially set mother's child support obligation at $612 per month, including $10 per month for arrears. The order did not specify whether mother was employed, but it stated that mother had the ability to earn $1,257 per month. The court set father's child support obligation at $477 per month, including $10 per month for arrears. The order stated that father was employed but did not specify father's income.

Over the next few months, both parents failed to make any child support payments. When petitioner learned that mother faced potential incarceration for failing to make payments, petitioner asked the court to reduce mother's child support obligation to $110 per month, including $10 per month for arrears. At the recommendation of the child support magistrate, the trial court reduced mother's child support obligation to $110 per month, beginning on July 1, 2017. Mother did not make any payments in July 2017. She paid $110 in both August 2017 and September 2017 using money that maternal grandmother gave her.

Mother and father consistently visited the children. During the summer of 2017, petitioner even allowed mother to babysit the children when petitioner's normal babysitter was unavailable. According to maternal grandmother and mother's best friend, the children were "upset" and sometimes cried when visitation with mother ended. There was little testimony regarding the children's visitation with father. Father testified that he bought the children food and gifts during his visits and that the children were always happy to see him. Petitioner testified about one occasion in which father violated the court's order by asking mother, rather than paternal grandfather, to supervise his visitation. Petitioner also testified that the children return from father looking dirty. Finally, petitioner testified about an incident in which C.L. returned from father with a "hole" in his head that required immediate medical attention. Father testified that C.L. hit his head on a coffee table after being pushed by one of father's grandchildren.

In October 2017, neither parent made child support payments. On October 31, 2017, petitioner filed a petition to terminate parental rights. The case lingered for nine months. During that time, both parents made additional child support payments and continued to visit the children. Mother worked intermittently as a babysitter. Mother testified that she bought the children over $200 worth of Christmas presents in December 2017 using money that she earned from babysitting.

In April 2018, CASA conducted a home visit at mother's new apartment. According to the CASA representative, the smell of smoke was "overwhelming." The CASA representative testified that Mother said she was not seeking employment due to her undiagnosed medical condition. Mother also claimed that her doctor would not fill out medical forms for her to apply for disability. Mother later denied making those statements. Shortly before trial, mother worked as a caregiver for about a week; she quit because her driver's license had been suspended due to failure to pay child support.

Father did not cooperate with CASA's attempt to conduct another home visit. In April 2018, father's criminal charges were dismissed because the arresting officer failed to appear for multiple court dates. Father never followed the treatment recommendations from his psychological evaluation. Although mother submitted proof that she attended a parenting and divorce class in October 2016, neither parent took additional parenting classes as required by the trial court's subsequent orders. Both parents continued to smoke in front of the children.

A bench trial took place on August 7, 2018.[4] The court heard testimony from petitioner, parents, mother's best friend, maternal grandmother, a CASA representative, and a DCS representative. The court entered an order terminating parental rights on October 4, 2018. A separate order containing specific findings of fact and conclusions of law was entered on October 29, 2018.[5] Both parents appealed.

## II.

Although not stated as such, mother and father raise the following issues:

> Whether the trial court erred by finding clear and convincing evidence that mother and father's parental rights can be terminated on the ground of abandonment by willful failure to support.

> Whether the trial court erred by finding clear and convincing evidence that mother and father's parental rights can be terminated on the ground of persistent conditions.

> Whether the trial court erred by finding clear and convincing evidence that termination of mother and father's parental rights is in the best interest of the children.

---

[4] Trial courts have a duty to "ensure that the hearing on the petition [to terminate parental rights] takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). In this case, the record does not indicate why the hearing was continued past the statutorily-prescribed six-month deadline. This unexplained delay is concerning, but we have consistently held that the untimeliness of a termination hearing is not reversible error. *E.g.*, **In re Maison W.**, No. M2015–02153–COA–R3–PT, 2016 WL 3192801, at *15-16 (Tenn. Ct. App., filed May 27, 2016).

[5] Trial courts have a duty to "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the [termination of parental rights] hearing." Tenn. Code Ann. § 36-1-113(k). Here, it took eighty-three days. Again, this unexplained delay is lamentable, but is not reversible error. *See, e.g.*, **In re Maison W.**, 2016 WL 3192801, at *15-16.

**III.**

A parent has a fundamental right, based on both the federal and state constitutions, to the care, custody, and control of his or her child. *Stanley v. Ill.*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash–Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996). Although this right is fundamental, it is not absolute. The State may interfere with a parent's rights in certain circumstances. *In re Angela E.*, 303 S.W.3d at 250. Our legislature has listed the grounds upon which termination proceedings may be brought. Tenn. Code Ann. § 36-1-113(g) (Supp. 2018) (amended 2019). Because termination proceedings are statutory, *In re Angela E.*, 303 S.W.3d at 250; *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004), a parent's rights may be terminated only where a statutory basis exists. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In the Matter of M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

To terminate parental rights, a court must determine by clear and convincing evidence the existence of at least one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citations omitted). Unlike the preponderance of the evidence standard, "[e]vidence satisfying the clear and convincing standard establishes that the truth of the facts asserted is highly probable." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005).

Once a ground for termination is established by clear and convincing evidence, the trial court conducts a best interest analysis. *In re Angela E.*, 303 S.W.3d at 251 (citing *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005)). "The best interest[ ] analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *Id.* at 254. The existence of a ground for termination "does not inexorably lead to the conclusion that termination of a parent's rights is in the best interest of the child." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App., filed June 26, 2006).

We are required to review all of the trial court's findings with respect to grounds and best interest. *In re Carrington*, 483 S.W.3d 507, 525-26 (Tenn. 2016) ("[W]e hold that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interest[ ], regardless of whether the parent challenges these findings on appeal.").

The Tennessee Supreme Court has stated our standard of review:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*Id.* at 523-24 (internal citations omitted). "When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to . . . the trial court's factual findings." *In re Adoption of S.T.D.*, No. E2007-01240-COA-R3-PT, 2007 WL 3171034, at *4 (Tenn. Ct. App., filed Oct. 30, 2007) (citing *Seals v. England/Corsair Upholstery Mfg. Co., Inc.*, 984 S.W.2d 912, 915 (Tenn. 1999)).

## IV.

The trial court found clear and convincing evidence to terminate mother and father's parental rights on two grounds: (A) abandonment by willful failure to support and (B) persistent conditions.

## A.

Tenn. Code Ann. § 36-1-113(g)(1) provides for the termination of parental rights on the ground of abandonment. When the petition to terminate parental rights was filed, "abandonment" was defined to include the following circumstances:

> [f]or a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent . . . the parent . . . ha[s]

- 8 -

willfully failed to support or ha[s] willfully failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(i) (effective July 1, 2016).[6]  This means that the parent willfully failed "to provide monetary support or . . . more than token payments toward the support of the child[.]"  *Id.* at § 36-1-102(1)(D).  " '[T]oken support' means that the support, under the circumstances of the individual case, is insignificant given the parent's means[.]"  *Id.* at § 36-1-102(1)(B).  A parent's "means" includes "both income and available resources for the payment of debt."  ***In re Adoption of Angela E.***, 402 S.W.3d 636, 641 (Tenn. 2013) (citations omitted).

"Whether a parent failed to . . . support a child is a question of fact.  Whether a parent's failure to . . . support constitutes willful abandonment, however, is a question of law."  ***Id.*** at 640 (citing ***In re Adoption of A.M.H.***, 215 S.W.3d 793, 810 (Tenn. 2007)).  "Failure to . . . support a child is 'willful' when a person is aware of his or her duty to . . . support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so."  ***In re Audrey S.***, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005).

**1.**

First, we consider mother's alleged failure to support.  The petition to terminate parental rights was filed on October 31, 2017.  Therefore, the relevant four-month period is June 30, 2017, to October 30, 2017.  *See **In re Jacob C.H.***, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App., filed Feb. 20, 2014) ("The applicable four month window . . . includes the four months preceding the day the petition to terminate parental rights is filed but excludes the day the petition is filed.").

At the recommendation of the child support magistrate, the trial court reduced mother's child support obligation to $110 per month, beginning on July 1, 2017.  Mother did not make any payments in July 2017.  In both August 2017 and September 2017, mother paid $110 in child support using money that maternal grandmother gave her.  In October 2017, mother did not make any payments.

The trial court ruled that "Mother did not make [the August 2017 and September 2017] payments," because "these payments were made by Mother's mother and not mother herself."  Even if the payments could fairly be attributed to mother, the court ruled that the payments were merely "token support."  The court found that "Mother is capable of working and has not taken steps to secure employment or otherwise earn

---

[6] We apply the version of the statute in effect when the petition was filed.  Under the current version of the statute, the petitioner no longer has the burden of proving willfulness; instead, a parent may demonstrate the absence of willfulness as an affirmative defense.  Tenn. Code Ann. §§ 36-1-102(1)(A)(i), -102(I) (effective July 1, 2018) (amended 2019).

income to support the children."

As an initial matter, we must decide whether the court erred by finding that mother did not make the August 2017 and September 2017 child support payments. According to petitioner, a parent who pays child support with money obtained from a relative is "logically indistinguishable from Child Support Enforcement intercepting a parent's tax refund from the federal government to satisfy, or contribute to, a parent's outstanding child support obligation." *See In re Dustin T.*, No. E2016–00527–COA–R3–PT, 2016 WL 6803226, at *13 (Tenn. Ct. App., filed Nov. 17, 2016) (holding that interception of a tax refund does not constitute a voluntary payment of child support). We disagree. The voluntary nature of a child support payment, rather than the source of the payment, is the most important consideration. We are unaware of any legal authority that prohibits a parent from paying child support with money obtained from a relative. On the contrary, the child support guidelines indicate that a parent is *expected* to use all available resources to pay child support. *See* Tenn. Comp. R. & Regs. 1240-02-04-.04(3) (requiring consideration of a parent's "gross income," including "all income from any source . . . whether earned or unearned, and includ[ing] . . . [g]ifts that consist of cash"). Accordingly, we hold that the trial court erred by ruling that mother did not make the two child support payments.

The next question is whether mother's payments constitute "reasonable payments" or "token payments" toward the support of the children. Tenn. Code Ann. §§ 36-1-102(1)(A)(i), -102(1)(D). Again, token support is defined as "support, under the circumstances of the individual case, [that] is insignificant given the parent's means[.]" *Id.* at § 36-1-102(1)(B). A parent's "means" includes "both income and available resources for the payment of debt." *In re Adoption of Angela E.*, 402 S.W.3d 636, 641 (Tenn. 2013) (citations omitted).

Mother was unemployed and therefore had no income during the relevant four-month period. It appears that mother's only "available resource[ ] for the payment of debt" was cash assistance from maternal grandmother, which mother used to make two child support payments. The trial court found that mother willfully failed to make additional child support payments because she was voluntarily unemployed. The evidence preponderates in favor of the court's finding that mother was voluntarily unemployed. Nevertheless, we think it is significant that mother managed to pay half of the child support she owed during the relevant four-month period. Although it is a close call, we disagree with the court's conclusion that mother's two child support payments were merely token support.

Even if mother's two payments *were* token support, petitioner failed to present clear and convincing evidence that mother had the *capacity* to provide more than token support, a necessary element of willfulness. *In re Audrey S.*, 182 S.W.3d at 864. A petitioner must submit evidence of a parent's income *and* expenses during the relevant

- 10 -

four-month period in order to prove that a parent had the capacity to pay child support. *E.g.*, *In re L.J.*, 2015 WL 5121111, at *6 (Tenn. Ct. App., filed Aug. 31, 2015) (citing *In re Adoption of Angela E.*, 402 S.W.3d at 641). Here, petitioner presented little evidence of mother's expenses. Maternal grandmother testified that mother did not have to pay rent or utilities, but mother testified that she did not receive food stamps. It is unclear whether mother was responsible for paying for food, groceries, and transportation. If she was, it is unclear what those monthly expenses were. Therefore, even if we imputed additional income to mother because of her voluntary unemployment, the lack of evidence regarding mother's monthly expenses would prevent us from forming a "firm belief or conviction" regarding mother's capacity to pay child support. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). Accordingly, we hold that the trial court erred by terminating mother's parental rights on the ground of abandonment by willful failure to support.

## 2.

Next we consider father's alleged failure to support. The relevant four-month period is still June 30, 2017, to October 30, 2017. Father's child support was set at $477 per month. Records from the Child Support Enforcement Services indicate that father did not make any child support payments during the relevant four months. The trial court ruled that father's failure to support was willful because father was employed by Cabbie Cab and was receiving benefits from the Social Security Administration. The court also noted that father was able to pay a $3,000 cash bond in December 2017 in order to avoid incarceration for his failure to pay child support.

At trial, father testified that he was expecting his $3,736 tax refund to be intercepted by Child Support Enforcement Services during the relevant four-month period. The refund was not credited to father's account until December 2017. Father also testified that he "borrow[ed]" money to pay the $3,000 cash bond in order to avoid incarceration. Father paid the cash bond shortly after his tax refund was intercepted. This actually put father ahead on his child support payments. Although this is relevant to the best interest analysis, it is irrelevant when analyzing abandonment. *See* Tenn. Code Ann. § 36-1-102(1)(F) ("Abandonment may not be repented of by resuming . . . support subsequent to the filing of any petition seeking to terminate parental or guardianship rights[.]"). Moreover, even if the tax refund had been intercepted during the relevant four-month period, interception of a tax refund does not qualify as a voluntary payment of child support. *In re Dustin T.*, 2016 WL 6803226, at *13. Accordingly, the evidence preponderates in favor of the court's finding that father failed to pay monetary support during the relevant four-month period.[7]

---

[7] Father argues that he provided "in-kind" support in the form of food and gifts. These gifts are not "monetary support," as required by Tenn. Code Ann. § 36-1-102(1)(D); however, father's provision of gifts does weigh against a finding of willfulness. *See In re Kaleb N.F.*, No. M2012–00881–COA–R3–

- 11 -

Nevertheless, we hold that petitioner failed to present clear and convincing evidence that father's failure to support was willful. Specifically, petitioner failed to present sufficient evidence that father had the capacity to support the children during the relevant four-month period. At trial, father testified, without contradiction, that he only earns between $350 and $750 per month as a cab driver. There is no evidence regarding the amount of father's benefits from the Social Security Administration. Father testified, without contradiction, that he "borrow[ed]" the money to pay his $3,000 cash bond. A CASA representative testified that in November 2016 father was receiving cash assistance from a friend and $500 per month in food stamps. However, that was several months prior to the relevant four-month period. The only evidence of father's expenses is father's testimony that his rent is $500 per month and that he has to pay family members to supervise his visitation.

Given father's limited income and the paucity of evidence regarding father's monthly expenses, we hold that petitioner failed to present clear and convincing evidence that father had the capacity to pay $477 per month in child support during the relevant four-month period. The trial court erred by terminating father's parental rights on the ground of abandonment by willful failure to support.

**B.**

Tenn. Code Ann. § 36-1-113(g)(3) provides for the termination of parental rights on the ground of persistent conditions. When the petition to terminate parental rights was filed, the statute required petitioner to present clear and convincing evidence of the following circumstances:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;
>
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians

---

PT, 2013 WL 1087561, at *23 (Tenn. Ct. App., filed Mar. 12, 2013) (holding that a parent's provision of gifts "may be considered as part of the background to the willfulness determination.").

- 12 -

in the near future; and

> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3) (effective July 1, 2017).[8] The purpose of allowing the termination of parental rights under these circumstances is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re Dakota C.R.*, 404 S.W.3d 484, 499 (Tenn. Ct. App. 2012) (citations omitted). "The failure to remedy the conditions which led to the removal need not be willful." *Id.*

## 1.

First, we consider the evidence with respect to mother. It is undisputed that more than six months had passed since the children had been removed from the home of mother.[9] The trial court ruled that mother "failed to remedy the conditions which . . . led to removal of the children from [her] custody." The preponderance of the evidence suggests otherwise. The primary condition that led to the children's removal from mother was mother's lack of a permanent home. Since April 2017, mother has had her own three-bedroom apartment; she no longer relies on family members for housing.

Nevertheless, mother's parental rights may still be terminated due to the persistence of "*other conditions* that in all reasonable probability would cause the child[ren] to be subjected to further abuse or neglect and that, therefore, prevent the child[ren]'s safe return to the care of [mother.]" Tenn. Code Ann. § 36-1-113(g)(3)(A) (emphasis added). The trial court found that mother has been voluntarily unemployed or underemployed throughout this case. Even at the time of trial, mother still did not have a steady source of legal income. Mother also had not taken the appropriate parenting classes. Nor did she provide the recommendations of her mental health assessment (if she did, in fact, complete the assessment). Finally, mother continued to smoke in the presence of the children.

The evidence preponderates in favor of the trial court's factual findings regarding the persistence of these "other conditions." We agree with the trial court that mother's

---

[8] We apply the version of the statute in effect when the petition was filed.

[9] At the time the petition to terminate parental rights was filed, the six-month period was generally measured from the order adjudicating a child dependent and neglected. *In re Frederick S.*, No. W2018-00941-COA-R3-PT, 2018 WL 6819355, at *5 (Tenn. Ct. App., filed Dec. 26, 2018) (citing *In re Audrey S.*, 182 S.W.3d 838, 875-76 (Tenn. Ct. App. 2005)). The children were adjudicated dependent and neglected on January 26, 2017 – nine months prior to the filing of the petition.

prolonged state of financial instability, coupled with her refusal to seek employment on account of an undiagnosed medical condition, creates a reasonable probability that returning the children to mother would subject them to further neglect.[10]  There is little likelihood that mother will be able to remedy her condition of financial instability at an early date because she has repeatedly demonstrated an unwillingness to obtain and maintain stable employment.  At the time of trial, mother had not even applied for food stamps.  Continuation of the parent-child relationship would greatly diminish the children's chances of early integration into a safe, stable and permanent home.  Accordingly, we hold that clear and convincing evidence exists to terminate mother's parental rights on the ground of persistent conditions.

**2.**

Now we consider the evidence with respect to father.  It is undisputed that more than six months had passed since the children had been removed from the home of father.  The trial court determined that the conditions which led to that removal still persist.  Specifically, the court noted that father's criminal charges were dismissed "only after the charging officer failed to appear in court after several resets."  The court further observed that father failed to comply with the treatment recommendations from his psychological assessment, i.e., alcohol and drug treatment and therapy to address "appropriate insight, judgment, and impulse control."

Father does not dispute the trial court's factual findings relative to this ground.  Instead, father argues that the court should have given more weight to the fact that his criminal charges were dismissed.  Father reminds this Court that individuals who are accused of a crime are presumed innocent until proven guilty.  That is true – in criminal cases.  Here, however, the trial court did not convict father of a crime.  Rather, the court found, by a preponderance of the evidence, that father has a history of alcohol abuse and that he has refused to seek appropriate treatment.  Those findings are supported by the evidence.  A CASA representative testified that father admitted to drinking six to eight beers per day for several weeks at the direction of his doctor, a false statement that father continued to assert at trial.  The examiner who conducted father's psychological evaluation also found that father suffered from "moderate alcohol-use disorder."  It is undisputed that father failed to seek either alcohol and drug treatment or therapy.

We agree with the trial court that this evidence clearly and convincingly

---

[10] Although a parent's unemployment and/or incapacity to financially support a child often precludes a finding of willful abandonment, prolonged financial instability is relevant to the termination of parental rights on the ground of persistent conditions. *See, e.g.*, *In re Jamie G.*, No. M2014–01310–COA–R3–PT, 2015 WL 3456437, at *22 (Tenn. Ct. App., filed May 29, 2015); *In re Brandon T.*, No. M2012–02055–COA–R3–PT, 2013 WL 12180664, at *5 (Tenn. Ct. App., filed Apr. 17, 2013); *State, Dept. of Children's Services v. Peterson*, 341 S.W.3d 281, 289 (Tenn. Ct. App. 2009); *In re C.M.S.*, No. W2004-00295-COA-R3-PT, 2004 WL 2715331, at *4 (Tenn. Ct. App., filed Nov. 19, 2004).

demonstrates that the conditions which led to the children's removal from father still persist.[11] Because father has failed to take appropriate steps to address his alcohol abuse and poor judgment, there is a reasonable probability that returning the children to father will lead to further abuse or neglect. Given father's stubborn resistance to seeking treatment, there is little likelihood that he will remedy these conditions at an early date. We agree with the trial court that continuation of the parent-child relationship will greatly diminish the children's opportunity to enter into a safe, stable and permanent home. Accordingly, we hold that there is clear and convincing evidence to terminate father's parental rights on the ground of persistent conditions.

## V.

## A.

Because at least one statutory ground warrants the termination of mother and father's parental rights, we now focus on whether termination is in the best interest of C.L. and A.L. We are guided by the statutory factors set forth in Tenn. Code Ann. § 36-1-113(i):

> In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interests to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been

---

[11] We also note that there are "other conditions" that raise serious questions as to whether returning the children to father would subject them to further abuse or neglect. For example, although father has worked as a cab driver throughout these proceedings, it is unclear whether father has the financial capacity to independently support the children.

- 15 -

established between the parent or guardian and the child;

> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
>
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
>
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
>
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
>
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

"Ascertaining a child's best interests does not call for a rote examination of [these] nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case." *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005). Most importantly, "[t]he child's best interest must be viewed from the child's, rather than the parent's, perspective." *In re Marr*, 194 S.W.3d 490, 499 (Tenn. Ct. App. 2005) (citing *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004)).

**B.**

The trial court expressly considered the best interest factors discussed above. The court determined that factors (1), (2), (5), (7), (8), and (9) weigh in favor of terminating mother and father's parental rights. The court determined that factors (3) and (4) weigh against termination of mother and father's parental rights. Finally, the court found that factor (6) was inapplicable.

- 16 -

Factors (1) and (2) concern whether parents made a lasting adjustment in circumstances and whether reasonable social services were made available to them. Mother and father both obtained safe and stable housing. Father also began working as a cab driver and his criminal charges were eventually dismissed. As previously discussed, however, both parents stubbornly refused to comply with simple instructions from the court regarding other important matters. Mother has demonstrated an unwillingness to obtain and maintain stable employment. Mother also failed to disclose the results of the mental health evaluation that she allegedly completed. Father has refused to seek treatment for his abuse of alcohol. He has also refused to attend therapy for "appropriate insight, judgment, and impulse control." Both parents continue to smoke in front of the children.

DCS and CASA made reasonable efforts to help mother and father regain custody of the children. For example, DCS helped the parties develop a permanency plan at a Child and Family Team Meeting on December 1, 2016. A DCS representative testified that she helped mother schedule (and reschedule) multiple mental health assessments. She also attempted to conduct home visits and to make phone calls to mother. DCS informed mother that she could apply for "Section 8 housing." The DCS representative spoke to father multiple times on the phone "[t]o try to help him, to follow up with him about his services, to see if he had followed up with his recommendations." CASA representatives also conducted home visits and attempted to help parents comply with the court's orders. We agree with the trial court that factors (1) and (2) clearly and convincingly weigh in favor of termination.

All parties, including petitioner, agree with the trial court's conclusion that factors (3) and (4) weigh against terminating mother and father's parental rights. It is undisputed that both parents maintained consistent visitation throughout the proceedings and that the children have a close bond with parents.

The court ruled that factor (5) weighs in favor of termination. This factor concerns "[t]he effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition." According to petitioner, the children's health has improved under her care:

> [A.L.] has opened up, she's a social butterfly that hasn't met a stranger. At first she's quiet, but then she doesn't stop talking, but she's so friendly, she appears more healthy. Both of the children have been more healthy in my care. They've – you know, they've gone to school, they go to school every day, they don't miss because "I didn't want to get out of bed," you know, they eat, they're not fed McDonald's every meal, you know, I cook for them.

- 17 -

*     *     *

> They're not constantly on antibiotics from this infection or that infection, [A.L.] had chronic ear infections, she's [had] one in two years. . . .  They don't have to take their sinus medication anymore, allergy medication, it's not necessary.

Petitioner attributed these positive changes to "a healthier home environment."  Petitioner also testified that she took C.L. to the hospital after he returned from father with a severe head injury that required staples.  Finally, petitioner testified that she does not smoke in her home.[12]  Accordingly, we agree with the trial court that factor (5) weighs in favor of termination.

The court ruled that factor (6) is inapplicable.  Petitioner disagrees and argues that this factor also weighs in favor of termination.  We agree with petitioner.  The children were adjudicated dependent and neglected in parents' care.  Thus, both parents "ha[ve] shown . . . neglect toward the child[ren.]"

We also agree with the trial court that factor (7) weighs in favor of termination.  As the court observed, both parents continue to smoke in their homes in violation of the court's orders.  Each time a CASA representative conducted a home visit with mother, the smell of smoke was "overwhelming."  Father has also failed to seek treatment for his alcohol abuse and has not attended therapy to address appropriate insight, judgment, and impulse control.  This further jeopardizes father's ability to consistently care for the children in a safe and stable manner.

The trial court ruled that factor (8) weighs in favor of termination.  The court noted mother's failure "to complete her mental health evaluation or provide the assessment to the Court."  The court also noted father's failure "to comply with the recommendations of his psychological assessment seeking further therapy to address appropriate insight, judgment, and impulse control."  We agree that these facts call into question the mental and emotional health of both parents.

Finally, factor (9) concerns whether parents have paid child support consistent with the child support guidelines.  The trial court ruled that this factor favors termination.  Mother did not pay any child support from March 2017 to July 2017.  She paid $110 in

---

[12] Father and maternal grandmother testified that petitioner does smoke in front of the children; however, a CASA representative testified that "[petitioner's] home is very appropriate, no safety concerns whatsoever."  The trial court did not make a specific finding of fact on whether petitioner smokes in her home, but the court seems to have made an implicit credibility determination in favor of petitioner and the various social workers who testified at trial.

August and September 2017 but did not make any payments in October or November 2017. She paid $510.45 in December 2017. Mother also made payments in February, March, and August of 2018. A few days before trial, mother sold her car to pay $550 in child support. It is unclear how much support mother still owes. Father did not pay any child support from March 2017 to November 2017. In December 2017, father's tax refund was intercepted. Father also paid a $3,000 cash bond which was used to pay his child support through April 2018. Father fell behind on payments in the summer of 2018. A few days before trial, father made another payment. At trial, father testified that he was less than $1,000 behind. The record supports the trial court's finding that parents have failed to pay child support consistent with the guidelines; however, parents' efforts to catch up on missed payments somewhat dilutes the significance of this factor.

In addition to the factors discussed above, it is appropriate to say a few words about petitioner and her relationship with the children. Petitioner is the maternal great-aunt of the children. She is a registered nurse and works three days per week from 6:00 a.m. to 7:00 p.m. Petitioner testified that her fiancé, who she has dated for fifteen years, "helps a lot" with the children. He also works. Petitioner's mother helps get the children to and from school; she also babysits the children when petitioner has to work. Petitioner testified that she "love[s] [the children] with all [her] heart and would do anything necessary for them." She intends to adopt the children. A CASA representative testified about her relationship with the children:

> The children appeared very bonded to [petitioner], they call her "auntie" . . . and then they call her fiancé Uncle [M.], they're very comfortable in the home, they're always doing activities, they're playing games . . . . They're outside playing with different types of ride toys; they're always clean, she's – if they need redirection she gives them redirection and they respond very well to her. I don't have any concerns about the care with [petitioner].

> \* \* \*

> The home is very appropriate, no safety concerns whatsoever. Each child now, when they first came they shared a bedroom, but now they each have their own bedroom and the last time I was there . . . the kids are very proud of their bedroom[s], they – they show off their bedroom and what it's decorated in, . . . they've always been very interactive with us when we go out to do the visits.

- 19 -

Considering the totality of the circumstances, there is clear and convincing evidence that termination of mother and father's parental rights is in the best interest of the children. In this case, we think factors (1) and (2) should be given more weight than some of the other statutory best interest factors. The children were removed from parents' custody in September 2016. At the time of trial, nearly two years later, mother showed no signs of being willing or able to maintain a steady job. Mother also displayed a complete disregard for the trial court's orders by failing to attend additional parenting classes, continuing to smoke in front of the children, and failing to attend or disclose the results of her mental health evaluation. Father showed no willingness to attend court-ordered therapy or alcohol and drug treatment. He also failed to attend parenting classes and continues to smoke in front of the children.

It is true that both parents consistently visited the children and maintained a meaningful relationship with them. That is certainly important. *See In re Addalyne S.*, 556 S.W.3d 774, 795-96 (Tenn. Ct. App. 2018). But "[t]he existence of a meaningful relationship between the parent and the child . . . does [not] foreclose the possibility that termination is in the child's best interest[.]" *In re Briana H.*, No. M2017-02296-COA-R3-PT, 2018 WL 4191227, at *14 (Tenn. Ct. App., filed Aug. 31, 2018). This is especially true when the child "also ha[s] a meaningful relationship with the foster parents," or other guardians. *See In re Holly B.C.*, No. E2012–00362–COA–R3–PT, 2012 WL 6727609, at *12 (Tenn. Ct. App., filed Dec. 27, 2012). The children clearly have a close bond with petitioner and her fiancé. Petitioner will be able to financially support the children. There is no evidence that petitioner has mental health issues or problems will alcohol. Petitioner's home is safe and presents no environmental concerns. Viewed from the children's perspective, termination of mother and father's parental rights is in their best interest.

## VI.

The judgment of the trial court is affirmed as modified by this opinion. Costs on appeal are taxed to the appellants, H.L. and R.L. This case is remanded, pursuant to applicable law, for enforcement of the trial court's judgment and for the collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., JUDGE